SNEED, J.,
delivered the opinion of the Court.
The controlling question in this case, is, as - to the jurisdiction of a court of equity, in reinstating the probate of a will alleged to have been set aside upon an issue devisavit vel non, upon a fraudulent combination be *233 tween the proponent and the contestants to procure that result; and whether the facts present such a case as will demand the .exercise of that jurisdiction.
The testator, Audley Harrison, had been twice married, and left his wife, Elizabeth, and fifteen children, surviving him; ten of whom 'were the offspring of the •first marriage, and five of the latter. On the 28th of November, 1852, and in his la'st illness, he caused his will to be written, which was witnessed and published on the succeeding day; and on the 30th of November, 1852, the testator died. His wife, Elizabeth, and his son, George Harrison, were nominated in the will as executors.
At the December Term) 1852, of the County Court of Warren county, where the testator resided at the time of his death, the last will and testament was duly probated and entered of record, and the executor and executrix named therein, accepted said trust, and were duly qualified. When the will was submitted for probate, no opposition was made to said probate. The children of the testator’s second and last marriage aré Alexander, Aud-ley, Thomas, Julia and Mary. ' The other legatees and devisees are his widow, and the children of the first marriage. At the April Term, 1853, of the. County Court, a portion of the latter petitioned for a re-probate of the will, with a view to contesting the same; and the cause was regularly transferred to the Circuit Court for probate, in solemn form, upon the issue devisavit vel non. At the June Term, 1853, of said Circuit Court, said issue was. submitted to a jury, and there was a verdict and judgment against the will. The executor, George Harrison, *234 then took out letters of administration upon his father’s estate; and at the time of his death, in 1859, had nearly-closed his said administration. He left a last will and testament, of which Harrison Smith was his .executor.
The present litigation had its origin in a bill filed on the 20tli of August, 1865, by Harrison Smith, executor of the last will and testament of George Harrison, deceased, against Alexander Harrison, Audley Harrison and others, the heirs of Audley Harrison and Elizabeth Harrison, both then being dead. The bill alleges that Aud-ley Harrison died intestate, in 1852, seized and possessed of a large real and personal estate; that a few years after his death, by a judicial decree, the homestead and six hundred acres of land was publicly sold, and that George Harrison, the administrator and the testator of complainant, became the purchaser, and the title was duly , vested by decree, “ leaving the residue of dower land unsold;” that George Harrison, before his death, in 1859, sold the said homestead of six hundred acres to Elizabeth Harrison, the widow, of his intestate, for the sum of $5,000, for which she and the defendant, Alexander Harrison, executed two notes, the one for $3,000, and the other for $2,000, and that said George Harrison executed a deed for the benefit of the said Elizabeth and her five children, Alexander, Julia, Audley, Mary and Thomas; that afterwards, at the September Term, 1859, of the Chancery Court at McMinnville, said contract was presented for confirmation, and was confirmed, and that $3,000 of said money was thus invested for and belonged to defendants, Audley, Mary and Thomas, leaving the second note unpaid; that said Elizabeth and Alexander were *235 placed in possession and have held the same ever since. The bill prays for 4he sale of the land, or so much thereof as may be necessary to enforce the vendor’s lien for the unpaid note of $2-,000.
In the decree of confirmation referred to in said bill, it appears that Elizabeth Harrison was the guardian of her said children, Audley, Mary and Thomas Harrison, and that the $3,000 paid was the money of her said wards.
The bill is answered by Audley and Alexander Harrison, separately. The former . answers on the 2nd of September, 1865, admitting the charges of the bill to be true, alleging that his brother and co-defendant, Alexander’, had for many years, had possession of the land, enjoying the rents and profits, and committing waste thereon, and closes with a prayer for' an account thereof. Alexander Harrison answered on the 6th of January, 1866, alleging that the proceeding by 'the complainant was but a continuation of a series of frauds, beginning in the fraudulent devices by rvhich the probate of his father’s will had been set aside, and he and his brothers and sisters of the whole blood, defrauded and swindled out of the estates devised to them under said will; that the land for which the note was executed, was his own land, and that at the time of the execution of said note he was young, and ignorant of the facts and unconscious of his rights; that the complainant’s testator, George Harrison, who had assumed the trust as executor of his father’s will, had combined with the other parties, and, by threats and intimidation, had coerced his mother to consent to a verdict against the validity of said will; that he, at the *236 time said issue was submitted to the jury, was only fourteen years of age, bis brother Audiey, ten years of age, and his brother Thomas, six years of age, and with no guardian or protector to look after their rights.
On the 8th of January, 1866, the said Alexander, for himself, and as next friend of his brother Thomas, who was yet under age, filed his original and cross bill, in which Audiey Harrison joins as complainant against the complainant in the original bill, and all others, the heirs and distributees of Audiey Harrison, deceased, in which these charges are more fully elaborated. The bill charges that the complainants, who were all of tender years when their father’s will was set aside, have but lately come to a knowledge of their wrongs; that the complainant, Aud-iey, in making his answer to the original bill of Harrison Smith, executor, had been induced to admit the charges thereof in ignorance of his rights, and by the assurance of complainant that it would be better for him to answer in that way; that the same solicitor who drew his answer, also prepared the original bill against him-. The said Alexander, for himself and his co-complainants, avers that the said Audiey is of imbecile mind, and the said Thomas of tender years, and the easy victim of imposture; and asks the protection of the Court against all interference with them by defendants, pending this litigation.
The bill assumes to give a historical narrative of the wrongs suffered by complainants, since the death of their father, at the hands of their brothers and sisters of the half blood, and calls for a discovery and answer to its charges. It avers that their father was of sound and *237 disposing mind at the time of the making of the will; that the said will was, in every respect, valid; that the same was regularly, and without objection, submitted to probate; that soon thereafter the defendants “set about devising means to destroy the will, and knowing that complainant’s mother was the only person interested in the will who could or would stand in the way of their purpose, they commenced a war upon her, threatening to kill her and burn her house if the will was established;” that they finally drove her, a good, but' weak and irresolute woman, into a compromise, by which it was agreed that the jyill should be set aside, and that the property devised and bequeathed to complainants should revert to the estate, to be divided under the laws of descent and distribution; that when the hour for the will case arrived, it was ascertained that the will was suppressed or destroyed, and a copy was substituted by consent; that though all parties were present at the trial, and the witnesses for the will were present ready to sustain it, yet no testimony was adduced; and the judgment, thus obtained by fraud, was rendered, setting aside the will; that George Harrison, “the leader in these frauds,” became administrator; that the whole estate had been sold and bought by the very persons most active in procuring said fraudulent verdict and judgment; that the said George Harrison, though the administrator procuring the order for the sale pf said lands, bought part of the same him.self, and, still further to complicate his fraudulent contrivances, sold said ■ lands to complainant’s mother, the complainant, Alexander, subscribing said note for the purchase money while a minor, and in utter ignorance of his *238 rights. The bill farther charges that since this litigation was begun, some of said defendants have, by menaces against complainants, Audley and Thomas, and by suing complainant for a large amount of damages for an alleged assault and battery, sought to intimidate complainants, and to compel them to desist from the further vindication of their rights. The bill prays that said verdict and judgment upon the issue devisavit vel non, be set aside and annulled for fraud, and that said will' be set up and established; that defendants be required to account for all moneys or other property of complainants which went into their hands under said fraudulent contrivances, and that all orders and decrees touching said estate, and the sales and transfer of property thereunder, be annulled and avoided.
The answer of the defendants is joint, and denies all’ charges of fraudulent intentions or contrivances in regard to the contest of said will. It asserts that the whole proceeding was in good faith, and done upon a thorough ■consideration by the parties and their counsel, of what was for the best interest of all. The defendants avow that they felt keenly the “unequal and iniquitous” distribution attempted by said supposed will; but they deny that they resorted to force, threats, or fraudulent devices, to coerce the mother of complainants to consent to the setting aside of said will. They admit that at the time of the trial of the issue devisavit vel non, one of the counsel for the contestants had the will in his possession, or that the same was found after his death, among the papers; that, with the exception of the disposition oí one promissory note for a very small amount, the administra *239 tion of said estate, has been closed, and the estate distributed; that complainants have, received their share, and that the complainant, Alexander, who is an immoral, dissolute and mischievous person, had long since squandered his share, and should not be allowed to disturb said distribution, without accounting for the large sums of money and the valuable property he has. received and squandered; that pending the litigation about the will, the complainant, Alexander, and his mother, in some manner not indicated in the bill, nor shown in the proof, caused the death of a valuable negro woman, named Sarah; that the said Alexander, since he came of age, and since his mother’s death, and after he had become acquainted with all the facts connected with the trial of the will case, had offered to pay the note of $2,000; that two of the ne-groes given by the will to the children of the first marriage, had been given by the alleged compromise to' the complainant, Alexander, and his mother. The answer embodies a demurrer, in which several causes of demurrer are assigned, which, in the view we have taken of this case, are not necessary to- be stated. The answer concludes with a positive denial of all fraudulent combination among the defendants, or fraudulent intent on the part of any one of them to do the complainants a wrong, and reiterates the statement that the contest was made in good faith; that able lawyers were in good faith employed on either side, with a view to a fair and honorable litigation upon the issue devisavit vel non; that the' suit threatened to be a serious and. angry one; that the will • itself was ‘ambiguous and uncertain in some of its.devises; that the title of some of the property devised was not in *240 the testator; that in view of all these facts, the counsel and parties on both sides, looking to the best interest of all concerned, and deprecating the result of a long and angry litigation about the will, and, if the same was established, dreading the burden of future suits to settle its' construction, advised and adopted a compromise, which resulted in the verdict and judgment complained ofj and in the subsequent fair and equitable distribution and partition of the personal and real estate of Audley Harrison.
We have given the substance of all the material aver-ments and charges of the bill and answer, omitting many which are not. deemed important for the full apprehension of the equities of the parties as presented in the pleadings.
At the April Term, 1868, of the Chancery Court at McMinnville, the cause was heard, and there was a decree for the complainants in the cross bill, Alexander, Audley and Thomas Harrison. By said decree, the proceeding in the^Circuit Court in the issue devisavit vel non, was declared to be null and void, having been procured by the fraudulent devices of George Harrison and the contesants ; that the same was not binding on the complainants, who were minors, and not parties to said litigation. The probate of the will of Audley Harrison, in common form in the County Court of Warren, was declared to" be in full force and vigor, and the same is reinstated. All subsequent sales, transfers and distributions of said estate, were declared to be null and void, ¿nd proper accounts were ordered for the adjustment of the equities of the parties, so as to restore them, as near as may be, to their rights under said last will and testament. The original bill of *241 Harrison Smith, Ex., 'was, by said decree, dismissed; and the note for $2,000, of complainant, Alexander, ordered to be surrendered for cancellation. The costs of the cause were adjudged against the defendants, and a lien declared upon the land of complainants for the fees of their solicitors, the amount of which was ascertained in the decree. The defendants appealed.
The great body of the proof taken, and much of the argument here, is upon the question whether the instrument in controversy was or was not the last will and testament of Audley Harrison; and in the peculiar and rather extraordinary aspect in which the rights of the parties are presented, we are unable to see how the consideration of that question can 'be ignored or avoided. But we can not, and do not, undertake to decide upon the validity of the will as a testamentary paper. While the court of equity is not the forum, for the trial of an issue devisavit vel non, yet, in a controversy like this, where its jurisdiction is invoked on account of its efficient remedial powers in such cases, it could take no contracted view in tracing the footprints of fraud; but, in order to the exact adjustment of the equities of these parties, its scrutiny would necessarily reach back to the beginning of this unhappy family feud; for the ultimate disposition ’’of the cause must not be made to depend upon an isolated transaction in the history of this litigation, but upon the equities of these parties, as they have existed from the inception of this controversy.
The Court is, asked, on the one side, to declare the proceeding in the Circuit Court of Warren county fraudulent and void, and to reinstate the probate in common *242 form of the will of Audley Harrison, or to declaim that the same is in full force and vigor. On the other hand, it is insisted that the trial of the issue devisavit vel non in the Circuit Court was in the nature of a proceeding in rem, and that the result is conclusive against all persons and parties in interest, whether sui juris or otherwise, and whether parties of record or not parties. And in this view, the Court is asked" to dismiss the complainant’s cross bill, and remit the parties to the same status in which that litigation found them; or, if that can not be done, to remand this cause to the Circuit Court for a re-trial upon the issue devisavit vel non. It has been correctly assumed in argument, that, if a court of equity has jurisdiction to set aside the judgment of the Circuit Court for fraud and set up the will, then it has jurisdiction for all purposes in adjusting the equities of these parties, as they are affected by said fraudulent judgment. That the Court has this jurisdiction, is not an open question here. It is well settled, that, a court of equity grants relief not only against deeds, writings and solemn assurances, but against judgments and decrees obtained by fraud and imposition. Reigal v. Wood, 1 John. Ch. R., 402; 1 Story Eq. Jur., § 252; 7 Hum., 391.
Fraud vitiates and avoids all human transactions, from the solemn judgment of a court to a private contract. It is as odious and as fatal in a court of law as in a court of equity. If is a thing indefinable by any fixed and arbitrary definition. In its multiform phases and subtle shapes, it baffles definition. It is said, indeed, that it is part of the equity doctrine of fraud not to define it, lest the craft of men should find ways of committing *243 fraud which might evade such a definition. In its most general sense, it embraces all “acts, omissions, or con-cealments which involve a breach of legal and equitable duty, trust or confidence justly reposed, and are injurious to another, 'or by which an undue and unconscientious advantage is taken of another.” 1 Bouv. L. D., 613. A judicial proceeding in rem, while generally binding upon all persons, is no more free from the fatal taint of fraud than a proceeding in personam, or an individual contract. When once shown to exist, it poisons alike the contract of the citizen, the treaty of the diplomat, and the solemn judgment of the court. It was observed by Lord Hardwick, that, in a court of equity fraud may be presumed from circumstances, but in law it must be proved. 2 Ves. Ch., 155. The more modern doctrine is, that courts of equity will grant relief upon the ground of fraud, established by a degree of presumptive evidence which courts of law would not deem sufficient proof for their purposes; that a higher degree, not a different kind of proof, may be required by courts of law to make out what they will act upon as fraud. Both tribunals accept presumptive or circumstantial proof, if of sufficient force. 1 Bouv. L. D., 613. And among the special cases of frauds against which a court of equity will relieve, Mr. Story enumerates frauds in verdicts, judgments, decrees, and other judicial proceedings. 1 Story Eq. Jur., § 252.
A trustee can do no act inconsistent with his trust or injurious to his cestui qui trust, and if he takes a personal benefit by such act, a fraudulent intent will be presumed upon very slight proof. Thus, one who assumes the execution of a will takes upon himself a solemn trust, *244 iii which his duties and his obligations are clearly defined by law. It is said by this Court that he is bound to maintain the validity of the will, if it be assailed, by the employment of counsel and the production of proof, and if he combines with others to defeat it, and it is set aside, those interested in its establishment, not being parties, may file their bill to have it established; and that when a court of equity sets aside the finding on an issue de-visavit vel non, against a will which has been previously proven, the probate is reinstated, and the parties to the suit in equity are concluded by a restoration of the probate. John v. Tate, 7 Hum., 388; et vid, Buchanan v. Matlock, 8 Hum., 390.
This Court, then, having the undoubted jurisdiction to inquire whether the probate of the will of Audley Harrison was set aside and vacated by reason of the fraudulent practices of the defendants, has jurisdiction for all purposes in the settlement of the rights of these parties growing out of that result. And in the exercise of that jurisdiction, it must consider the factum of the will itself, not to assume the prerogative of a court of law in determining the issue devisavit vel non; but in order to ascertain whether the equities of the parties demand that the cause be remanded for a re-trial on that issue, or whether the proper judgment should be, that the first probate be reinstated. This is not a case in which, in the language of Chancellor Walworth, the part over which this Court has an unquestionable jurisdiction, necessarily draws to it the decision of the question as to the validity of the will. Brown v. Idley, 6 Paige Ch. R., 50. With that question this Court has nothing to do. But without *245 wandering from the proper sphere of a court of equity, we must yet briefly review the circumstances from the beginning, which have culminated in the alleged fraudulent proceeding in the Circuit Court, in order to understand the precise equities of these parties.
The learned counsel on both sides have happily anticipated this necessity in the adjudication of this cause, and have addressed themselves with great ability to the examination of the equities of the. parties from the beginning. And to demonstrate these equities, the greater-part of the vast volume of proof taken in the cause, has been directed.
While the fairness and justice of the family settlement and compromise agreed upon between the parties, can not in any degree affect the rights of these complainants, who were not, and could not be, parties thereto, we may concede that most of the parties acted in good faith and upon their best judgment as to what was for the best interests of both the complainants and defendants. If it be true, as alleged in the answer, that the counsel on both sides, who are known to be honorable men, had, with a view to prevent a long and angry litigation in having the will established, and to avoid the burdens of the many suits which might follow to settle its construction, advised the compromise which was adopted, then we might almost commend the motive if we condemn the imprudence of one of them, who, it is said, suppressed the original will, and of whom we are unwilling to believe that he could have been actuated by any corrupt or fraudulent purpose.
. The will of Audley Harrison has been characterized *246 by the defendants, who are his children, as an “unequal and iniquitous” disposition of his property. The mere fact that a testamentary paper is unfair and inequitable, of itself, furnishes no reason to repudiate that paper as a valid testamentary act. As an isolated fact., it can only generate a bare suspicion that there has been on the one hand fraud and improper influences in procuring the will, or on the other, a want of that disposing mind without which there can be no will. It may be observed that there is among juries of the present day, and especially in this State, a mischievous proclivity to set aside wills on the slightest grounds, if there be the semblance of inequality in the testamentary dispositions. Though it springs from an instinct of natural justice, yet nothing could be more pernicious in its consequences. The harmony of the domestic hearth, the reverence due to parental authority, the comfort of decrepit old age, the filial piety of youth, the inducement to industry in the acquisition of property, all more or less depend upon the sanctity of the testament, and the valued and unrestrained prerogative of the citizen in disposing, upon his own volition, of the property he has acquired by long years of honorable toil. It was observed by an eminent jurist of this State, that here, where the laws dispose of estates in a manner so consonant to the principles of justice and the feelings of an enlightened community, there can be no reason why the courts, by an over-solicitude to establish wills, should so greatly expose the heirs and next of kin to be defrauded. Suggett v. Kitchell, 6 Yerg., 430. This remark, as it was intended in that case, was eminently right and proper; but, as interpreted in others, it has *247 been most prolific of mischief. The object of the law of descent and distribution was certainly to provide for a just and equitable distribution of the estates of such persons as should die intestate among the heirs and dis-tributees who are entitled to the property. It reserved to the citizen, however, the right to dispose of his whole estate by last will and testament; and this is among the rights held most sacred by the law. It is among the boasts of our fervid freedom, that,, in the exercise of that right, he may, if he chooses, ignore the claims of wife, children, parents, brothers and sisters; and he may adopt as the object of his bounty some stranger to his blood, and thus repudiate the dearest ties of gratitude and affection.
If it be true, as intimated in the proof, that Audley Harrison, after his second marriage, did not get along very harmoniously with the children of his first marriage, then the will is a marvel of parental leniency, as only one of them is entirely disinherited; and the reason of the old man’s long-cherished purpose as to her is abundantly shown. This is Nancy Hennessee. It seems from the proof that, at the time of the preparation of the will, the testator was very ill and much under the influence of opiates. But the law takes no cognizance of mere physical infirmity as an objection to a will, if the disposing mind be manifest. Nailing v. Nailing, 2 Sneed, 630. He would sleep most of the time. When it was announced that the draftsman of the will had arrived, he turned over in bed and said to his wife who was sitting by the bed-side: “I have long intended to write my will. I now intend to do it; for they *248 will take everything from you and your children.. I intend to fix it so they can not do it.” He then proceeded to dictate the terms of the will. He would fall asleep in the intervals of writing, and on being aroused again, he would call for the reading of what had been written; then dictate another item, and so on to the close. When the will was witnessed and published, it was read over to him while he sat up in bed, and he said it was about as good as he could make it. In the course of its preparation he said he did not wish Mrs. Hennessee to have any of his estate. His wife observed that she had raised Mrs. Hennessee, and asked him to make her equal with the rest. But he was obdurate and determined. His wife also reminded him that he had forgotten Nelly McGregor, also a child of his first marriage; and she was remembered in the will. In his last hours the testator was irritable. The defendant, Milly Smith, one of the children of the first marriage, who was made a witness for defendants, testified as follows: “My step-mother handed the will to him to sign. I heard my father say, ‘Give it here; if I do not sign it very soon, it will be too late. I don’t know but it is too late now.’ My father said to me that I would have to help him up and sit at his back. My step-mother handed him the will. He remarked that for one cent he would not sign it to save her life, as he did not know what was in it, nor did he care. He signed it, and said he did not know whether he had done it or not, or whether it would do or not. After he laid down he remarked that she was crying and whining around him, and that he did not know what itwas for.” *249 It is stated, however, that the testator .dictated the whole will himself, except at the suggestion of his wife he changed the bequest of a negro to one of his sons by substituting another in his stead, in conformity with what seems to have been his previously expressed intention. He now and then, according to the testimony, asked the suggestions of his wife; but she refused to give them, except to intimate her choice as to certain sheep and hogs which were the subject of bequest at the moment. It was stated by the subscribing witness and others, that the testator was a man of firm and determined character; that, though physically feeble, he was thoroughly at himself when the will was dictated and prepared; and that on the day after the scene related by Milly Smith, while sitting up in bed, he had the will read to him; said it was as good as he could make it, and requested the witness to attest it as his will. It is stated, also, that he was devotedly attached to his wife, and that his greatest trouble in dying was in parting with her. That his wife should have been anxious to have the will written, and her children and herself provided for, was most natural, and not improper; that she used any fraudulent or undue influence to have herself and her children preferred, it is not proper to be inquired of in this proceeding.
It was among the quaint sayings of Swinburne, that it is not unlawful for a man, by honest intercessions or modest persuasions, to procure either another person or himself to be made executor; neither is it altogether unlawful for a man, even with fair and flattering speeches, to move the testator to make him his executor, or to give *250 him. his goods. Tiedf. on Wilis, 519. And it is said that the influence to. render a will void must be intentionally exercised, so as to overcome free agency, by the seduction of flattery, importunity, false information, or menaces. The influence resulting from habitual confidence, or even deference, on the part of the testator, acquired by affectionate attentions or general kindness, will not be sufficient for that purpose, unless addressed to a mind of unresisting imbecility, and which has lost the power of self-direction. Martin v. Teague, 2 Speerds. 268.
In the view we have taken of this case, we do not think it a proper case to be remanded for a re-trial of the issue devisavit vel non, even if that question were properly before us, in the state of the pleadings.
It remains to consider the effect of the proceeding in the Circuit Court of Warren county, by which the will of Audley Harrison was set aside and destroyed. George had assumed the execution of his father’s will. The widow, who is described as a weak and irresolute woman, was nominally an executrix, but George Harrison was the active, leading spirit, controlling the affairs of his father’s estate. A message from his dying father, had overtaken him on the piazza of his father’s house. The old man wished to know if George would become his executor, if not required to give security. The witness states that George, after a little reflection, consented. In a few days he entered upon his solemn trust. He was charged with the interests and fortunes of his three young half brothers and two young half sisters, who were unable to protect themselves. He was sworn to execute and carry out his father’s will. We find him sending mes *251 sages to his step-mother, admonishing her that if she does not consent to set aside the will they will give her trouble. He does not threaten her himself, but he warns her of what others will do. ~We find it stated that others are threatening to burn her house if she does not compromise. Thus standing alone, amid her troop of little children, she finally consented to a compromise, by which those children were defrauded of their rightful patrimony.. The issue upon the will is ready to be tried. The subscribing witnesses and all others are present, and ready to sustain the will. The original script is lost, and can no where be found. It is ascertained, afterwards, to have been in the possession of one of the counsel. The Court suggested that a copy from the records of the County Court would answer. A copy was procured. The jury were sworn, and the Court commanded that the trial proceed. George Harrison, whose duty it was to call in his witnesses and sustain the will, whispered to his counsel,, instead. Forrest and Paine and others, were there, ready, it is said, to establish the will by their testimony. But no witness was called within' the bar or examined. George Harrison having whispered» to his counsel, the lawyer arose and addressed these words to the Court: “May it please your Honor, we cannot sustain the will.” At this instant, the contrivance was so noticeable and. patent to the idle multitude behind the bar, that the witness, Martin, states that when this scene occurred between George Harrison and his lawyer, a man near him whispered these words into his ear: “Don’t you see that? That makes George Harrison an heir.” The jury at once *252 pronounced a verdict against the will, upon which the Court rendered judgment, and thus ended the trial.
On such a case as this, the complainants have not appealed for relief in vain to a court of equity. That forum would defile its prestige as a court of conscience, if it gave its sanction to such a transaction. If there be one thing above another which may be said to adorn the jurisdiction of a court of equity, it is its jealous readiness in vindicating the integrity of a trust.
The decree of the Chancellor is, in all things, affirmed; the probate of the will of Audley Harrison is reinstated, and declared to be in full force and vigor; and this cause is remanded to the Chancery Court at Mc-Minnville, to be proceeded in according to the decree of the Chancellor.
■Afterward, on the 14th of January, 1871, the following opinion was delivered:
. A motion is made at the bar to remodel the decree in this cause pronounced at a former day of this term, so as noi to preclude the parties from ascertaining by judicial inquiry, the true interpretation of the testator’s will as to what particular lands or other property, was devised or bequeathed by said will to complainants. The opinion of the Court, heretofore announced in the cause, does not preclude such an inquiry; nor does the decree of this Court or the court below; nor are the parties precluded by either from any rerhedy known to the law, by which the validity of the will itself, or the interpretation thereof, may be tested and ascertained. The doctrine of the *253 opinion is, tbat tbe Chancery Court, having jurisdiction to declare the judgment of tbe Circuit Court in setting aside tbe will void for fraud,- bad jurisdiction, also, to adjust the equities of all tbe parties, so far as they are affected by such fraudulent judgment, and so far as these equities can be considered in this cause upon tbe state of the pleadings; tbat, having ascertained that tbe paper writing purporting to be the will was once duly probated, and that said probate is still in full force and effect, it must be treated as a will until tbe contrary be made to appear. This was the basis of the decree below. The decree of the Chancellor was affirmed here, in all things. But that decree does not undertake to interpret the will or to designate the particular lands intended to be devised to the complainants. The writ of possession decreed by the Chancellor is ordered to issue ‘to place complainants in possession of the several tracts of land devised to them in the will of Iheir ancestor, Audley Harrison.” But it does not assume to designate what land it is, nor does it identify the land as the land described in the pleadings; but it gives the writ of possession for the land devised by the will. If the Sheriff, in executing said writ, seeks to put complainants into possession of any land not devised by the will, the defendants have their remedy, which is in no respect embarrassed by the decree below, which is in all things affirmed by this Court.
The decree heretofore entered may, however, be so changed as to interpret more clearly the judgment of the Court, as herein indicated.