ELIZABETH ALLEN, Appellant, v. SAM GOLD-
STEIN, Appellee.—291 S. W. (2d) 596.

Western Section. February 22, 1956.

Petition for Certiorari denied by Supreme Court, June 8, 1956.

W. H. Fisher, Memphis, for appellant.

Strauch & Jones, Memphis, for appellee.

BEJACH, J. This cause involves an appeal by Elizabeth Allen from a decree dismissing her bill filed against defendant, Sam Goldstein, in the Chancery Court of Shelby County, Tennessee, for the purpose of setting aside a trustee's deed. The parties will be referred to as in the lower court, complainant and defendant, or by their respective names.

Complainant's bill alleges that on November 23, 1953, she purchased from defendant, Lots 1, 2, and 3, Dilatush and Crane's East Dixie Heights Subdivision, as shown in plat of record in Plat Book 10, page 55, Register's Office of Shelby County, Tennessee,—said lots having a frontage of 210.03 feet on the west side of Ragan Street, Memphis, Tennessee, and running back 670 feet. The bill

alleges that she paid $1,500 cash and executed a trust deed securing a note for $10,700, representing the balance,—which note was payable in flat monthly installments of $60 per month, beginning December 12, 1953. The bill alleges that complainant received a schedule of payments, and made inquiry as to where she should pay, but was not advised as to this. The bill alleges that she made some payments to Mr. Sam Okeon, the real estate agent who handled the sale, and who was the brother-in-law of defendant; but that Mr. Okeon was reluctant to take the payments, and after having taken same on three occasions, declined to accept any further payments. The bill alleges that she made numerous efforts to make payment to defendant at his place of business, or to his wife, but that they were evasive at all times and in many instances, refused to accept payments, or made it so difficult for her to make payments, that they were deliberately trying to create a default and foreclose the trust deed. The bill alleges that by such unfair tactics, defendant produced an apparent default, on the basis of which he started foreclosure on May 10, 1954; and placed the matter in the hands of his then attorney, Mr. Sam Taubenblatt. The bill alleges that this foreclosure was not warranted, but that in order to reinstate her indebtedness, she was forced to pay the sum of $78.50 before she could carry on with her payments. The bill further alleges that by similar methods, defendant produced another situation which he declared to be a default and employed another lawyer, Mr. Irving Strauch, who began another foreclosure, and that both defendant and Mr. Strauch refused to receive payments. This foreclosure proceeded to conclusion and the trustee's deed conveying the property to defendant, Goldstein, who bid the property in at the foreclosure for the sum of $7,500, is record-

ed in Book 3421 at page 186, Register's office of Shelby County, Tenn., same being dated January 14, 1955. This is the trustee's deed, recision of which is sought in complainant's bill. The bill alleges that the foreclosed property has a value of between $15,000 and $20,000.

The answer of defendant denies that Sam Okeon is his brother-in-law, and denies that he was reluctant to take payments or issue receipts. He denies that complainant could not find him at his place of business, and denies that he was unwilling to execute receipts for payments; or that he sought to cause complainant to be in default. He denies that complainant was at all times able, ready and willing to meet the monthly payments, as is alleged in her bill, and denies that she would have done so regularly had it not been for his conduct. He denies that he had been guilty of any unfair tactics. He admits that the property was foreclosed and bought in by him for $7,500, but denies that same has a value of from $15,000 to $20,-000. The answer calls attention to the fact that the mortgage which was foreclosed, provides that if complainant fails to make payments when due, that same can be accelerated; and that in view of complainant's default, he did accelerate the indebtedness and required all of same to be paid.

The cause was tried by agreement on oral proof. The proof thus adduced in open court, consisted of the testimony of complainant and that of her daughter, Marietta Brinkley.

During the cross-examination of Marietta Brinkley, being advised that the complainant had no further proof to offer, other than the testimony of her lawyer, W. H. Fisher, who would testify only that upon receipt from

complainant of the sum of $120, he telephoned Irving Strauch, solicitor for defendant, and offered to pay that sum to him, the Chancellor, on his own motion, stopped the trial of the cause, declined to listen further, and stated:

"This proof is wholly unsatisfactory at best; but if I were to assume that it was satisfactory, the complainant couldn't prevail in the lawsuit. 'He who comes into equity must do equity.' There has been no proper tender in this case of monies to defendant. Furthermore, the proof shows the matter was in the hands of complainant's attorney before the foreclosure took place. The court will take judicial knowledge of the fact, and knows as a fact, that there was an available remedy in court if the situation had been as has been stated. The bill will be dismissed at complainant's cost.

"This Court will be adjourned until 10:00 o'clock tomorrow morning.

"You lawyers will divide your exhibits.

"Mr. Reporter, let the record show that the evidence in this case is wholly incredible."

A final decree was entered June 10, 1955, from which decree the present appeal has been taken to this Court.

Complainant, as appellant, has filed four assignments of error in this Court. The first assignment questions a ruling of the Chancellor to the effect that complainant was not entitled to make use of statements contained in defendant's answer as to payments made on certain dates. The second assignment challenges the action of the Chancellor in interrupting the testimony of the witness, Ma-

rietta Brinkley, closing the trial at this point, and thus depriving complainant of the right to re-examine this witness. The third assignment of error challenges the ruling of the Chancellor that a lack of proper tender was fatal and that some other remedy was available. The fourth assignment complains of the Chancellor's ruling that the evidence was wholly incredible, and of his dismissal of complainant's bill.

Before taking up the assignments of error separately, we deem it advisable to consider the evidence generally. This evidence consisted only of the testimony of complainant, herself, and that of her daughter, Marietta Brinkley,—supplemented by a few documents, or written matter such as receipts, the schedule of payments, the closing statement in connection with complainant's purchase of the land involved, the trust deed which was foreclosed, and carbon copies of letters written by Mr. Sam Taubenblatt, and defendant's present attorneys, Strauch and Jones. Taken as a whole. the testimony is rambling, confusing, and evasive, almost to the point of incoherence. A fair sample of this, taken from complainant's own testimony, is as follows:

"Q. And then you paid on October 21? A. Yes, sir.

"Q. Now, did Mr. Goldstein mark the October 21st payment correctly on your—A. No, he didn't, he didn't mark it so. I think he marked it incorrectly. (Paper passed to witness, who examines same.) This was the 12th, the note. He marked it the 10th, and then managed to change it around to the 9th. (Witness examining paper.)

"Q. Did you agree to that? A. No.

"Q. Was that correct? A. No, it was not, because I had thought, myself, the note—it should have run in concordance with the note.

"Q. For your November payment, were you able to pay that to him? A. No, sir.

"Q. Why? A. He told me when I paid the October note that he was too busy for that, for this. I toted it down to the delicatessen. He told me he was too busy to write—to write the payment. I toted it to the delicatessen; and he said to go next door to do that. He said to go to Mrs. Okeon, to let her do that.

"Q. Did you go there? A. I did, before another payment date. I didn't go the first time myself; I told my daughter, Marietta, I remember, to go, but when she did, there wasn't anybody there. The next time she went by, Mr. Okeon's brother was in there. He couldn't do that, so she didn't start to ask any questions. She then tried to call him.

"Q. Who? A. Mr. Okeon; but she didn't get any answer. So finally—I think it was after the 20th of November that I finally got him, Mr. Okeon, on the phone.

"Q. What did he tell you? A. He told me that there wasn't anybody down there, the reason I couldn't find him. He said, 'We have not been around for more than two weeks.' I said, 'Well, Mr. Goldstein told me that I could get Mrs. Okeon to write the receipts for me—I had a note which was past due—to me; and he said, 'I thought he had took it out of my hands. I am glad he has. I am not bothered about it any more.' I said, 'He told me to go to her, and said she is down with you.' He said, 'She is not

down here, never.' He said, 'She is there with him, in the delicatessen.' I said, 'He didn't tell me that. I have been looking for her at your office.' He said, 'Well, she has never worked with me.'

"Q. Did you try anywhere else? A. I went there then.

"Q. Where? A. The delicatessen.

"Q. To Mr. Goldstein? A. To the delicatessen.

"Q. To the delicatessen? A. Yes.

"Q. What did you find there? A. I found her.

"Q. Who? A. Mrs. Okeon, and when I walked up to the table where she was, to get the receipts, she was waiting on people. I said, 'This is Mrs. Okeon?' She looked and smiled and said, 'I am.' I said, 'Well, I am supposed to leave payment for the two notes with you.' She gave me another twisted smile and said, 'No, I can't take it', that she had nothing to do with it.

"Q. You tried to make two payments? A. For the two notes.

"Q. You had tried to make payments before that? A. Long before the first note was past due, and I had tried to make the December note payment along with it.

"Q. Did you have the money? A. I did, $120.00.

"Q. What did you finally do with that money? A. Brought it to your office the same evening, and I showed the roll of bills to you, it was $120.00, and wanted to get your advice as to what to do.

"Q. You had tried to make the payments on the note? A. I had.

"Q. All that time? A. In fact.

"Q. I mean, as you have related? A. Yes.

"Q. You were not able to do it?

"The Court: Just a minute here. Is this witness testifying that she brought this money to your office, Mr. Fisher, before the foreclosure proceeding was started?

"The Witness: I didn't know there was—that there was a foreclsoure until Mr. Fisher tole me.

"The Court: I am asking Mr. Fisher.

"Mr. Fisher: As to the date when she brought it, December 22, 1954, when she deposited $120.00 with me—

"The Witness: But I had been there a week before, and you wouldn' take it. You said, 'Hold that money.'

"The Court: When was the foreclosure?

"The Witness: January 10th.

"Mr. Strauch: The foreclosure was December 16th.

"Mr. Fisher: It is dated January 10th.

"Mr. Strauch: Started December 16, 1954.

"The Witness: Well, I was in his office—

"Q. Had you brought the money to my office prior to that time? Mr. Fisher, before the foreclosure proceeding was started?

"The Witness: I didn't know there was—that there was a foreclosure until Mr. Fisher told me.

"The Court: I am asking Mr. Fisher.

"Mr. Fisher: As to the date when she brought it, December 22, 1954, when she deposited $120.00 with me—

"The Witness: But I had been there a week before, and you wouldn't take it. You said, 'Hold that money.'

"The Court: When was the foreclosure?

"The Witness: January 10th.

"Mr. Strauch: The foreclosure was December 16th.

"Mr. Fisher: It is dated January 10th.

"Mr. Strauch: Started December 16, 1954.

"The Witness: Well, I was in his office—

"Q. Had you brought the money to my office prior to that time? A. Yes, I had.

"Q. When? A. The week before, December 16 I think it was.

"Q. The week before, you actually did? A. Yes.

"Q. What was it you said happened? A. I told you that she said that she couldn't accept the payments, that I couldn't go to her for that. I said, 'That is too much—a lot of money, with having people to give me the run around.'

"Q. You did not deposit the money with me the first time? A. You wouldn't accept it, but you looked at it, to know that I did have it."

■ This is a fair sample of complainant's own testimony, and it is typical, also, of that of her daughter, Marietta Brinkley. We are not surprised that the learned Chancellor gave no probative weight or value to such testimony. Wholly aside from the provision of sec. 10622 of Williams' Annotated Code, sec. 27-303, Tenn. Code Ann., which requires that on appeal the evidence must preponderate against the Chancellor's decree in order to warrant a reversal, it appears to us that the evidence in this case totally fails to establish a case for complainant. This is especially true where, as in the instant case, the evidence required to set aside the trustee's deed which is attacked, must be of the clearest and most convincing nature. Gibson's Suits in Chancery, 4th Ed., sec. 447; 5th Ed., sec. 455; Wry v. Cutler, 59 Tenn. 28; Hall v. Fowlkes, 56 Tenn. 745, 753; Haynes v. Swan, 53 Tenn. 560; Holder v. Nunnelly, 42 Tenn. 288; McCammon v. Pettitt, 35 Tenn. 242; Pomeroy, Equity Jurisprudence, sec. 862. When we consider that the Chancellor saw the witnesses face to face, and observed their attitudes and demeanor on the witness stand, whereas we have only the cold transcript of the words actually spoken, we have no hesitancy in holding that appellant in this case has totally failed to establish that the evidence preponderates against the decree of the lower court, and the presumption in favor of the correctness of the Chancellor's decree must remain in full force and effect.

The record discloses that the complainant is a woman of property, and that neither her original bill nor her appeal are being prosecuted on the pauper's oath.

We will now take up separately, appellant's assignments of error.

■ Assignment Number 1 challenges the ruling of the Chancellor that complainant was not entitled to make use of statements contained in the defendant's answer as to payments paid on certain dates. The predicate for this assignment of error is what occurred in the opening statement of complainant's case, which appears in the record, as follows:

"Mr. Fisher: Now, it will aid in the grasping of the testimony if I may read from the answer of the receipts that they concede in that.

"The Court: All right, sir.

"Mr. Fisher: (Reading) 'December 12, 1953,—'

'The Court: What is that?

"Mr. Fisher: The first payment was December 14th.

"Mr. Strauch: I ask if he is admitting averments in the answer, throughout, as to when payments were made?

"Mr. Fisher: I am entitled to use the answer for study.

"Mr. Strauch: I ask the Court, in reading from the answer is he reading this in evidence, as part of the evidence? ·

"The Court: Not unless he admits its truth.

"Mr. Strauch: Is he admitting it, as far as the payments were concerned?

"Mr. Fisher: I am not admitting; I am reading what is stated in there.

"The Court: You may read the answer to the Court, in connection with your case, without being obligated by it; but if you are reading in evidence, you can't read evidence without admitting the truth of it.

"Mr. Fisher: Well, that was not my purpose. It was in order to provide Your Honor with a background for study of our receipts.

"The Court: All right, sir. (Addressing Mr. Strauch): Let us see what he has in mind. You may object after he finishes, if you wish.

"Mr. Fisher: He has listed, December 14, January 20, March 1,—

"The Court: December 14, 1953, January 29, 1954, March 1, 1954.

"Mr. Fisher: April 5, 1954; and when a foreclosure was pending, he says there was paid three notes. The three notes—

"The Court: That was apparently three notes, to bring it to date.

"Mr. Fisher: All right; then next he states, after those three, September 7, and October 21. These are the payments which he states in his answer. Now, I am filing a series of receipts, and while he is looking at them, if I could have the Court make a note of them for comparison—

"The Court: All right.

"Mr. Fisher: December 31, January 30, March 1, April 6, and then two notes, plus twenty dollars in addition, June 11, August 3, September 7. Those are the receipts and then the final one on the schedule, which shows October 21. Those are the ones we offer.

"The Court: Well, apparently you claim one more payment than he does.

"Mr. Fisher: Two more. We claim one for December 14, and one on the 31st.

"The Court: One for the 14th?

"Mr. Fisher: Of December.

"The Court: You have a receipt for that one, the 14th?

"Mr. Fisher: That is one conceded in the answer.

"Mr. Strauch: Mr. Fisher has some receipts for a check and the check itself. I don't know whether that is one of those payments.

"Mr. Fisher: That is one of the questions. If Your Honor will let me say, the receipt that Your Honor will examine is written in pencil, and thereafter someone has put thereon in ink that it is a check for payment number four. That deals with that.

"The Court: The Court in developing what you claim, what you have paid according to your own theories of this case, there is one thing that occurs to me in connection with it. You are seeking to set aside a foreclosure sale, and there is no tender whatever in this case of any amount, admittedly. How about that, Mr. Fisher?

322

"Mr. Fisher: She has deposited money with me for the two notes, which I did offer to them, one hundred and twenty dollars. I wish that—

"The Court: What is that?

"Mr. Fisher: She has on deposit with me, and has had since December 22, 1954, money for the two notes, and I attempted to pay the one hundred and twenty dollars, and made a tender.

"The Court: Does that show in the pleadings here?

"Mr. Fisher: No, it is not shown in the pleadings.

"The Court: Is it not the law that the complainant in a case of this kind would have to make tender and keep that tender good?

"Mr. Fisher: We will show that we were not in default, that she attempted to pay, and on these notes, November notes, went there with the money to pay him and they refused it.

"The Court: Well, we will hear the proof.

"Mr. Strauch: I want to make this statement: Mr. Fisher is trying to use my answer as to the dates of payment, he is trying to do that. If he is adopting my answer as proof, I would like to have that declared at this time; otherwise, I don't think he can use my answer as part of his proof.

"The Court: The Court is not going to allow him to do that, Mr. Strauch. In other words, he is going to have to prove it. If he wants to admit what is in your answer, well, he may do so as part of his case. If he wants to prove his case he may do that.

The Court will require him to make proof of payment that he alleges.

"Mr. Fisher: I take the view that complainant is entitled to rely upon the sworn answer of the defendant. Of course, she is entitled to rely upon the sworn answer of the defendant; and the defendant is not entitled to amend his answer, but is bound by his answer.

"The Court: The Court is going to try the case on the facts, what may be shown."

Appellant's brief cites in support of this assignment of error, Gibson's Suits in Chancery, 3rd Ed., sec. 558, and Farmers State Bank v. Jones, 34 Tenn. App. 57, 232 S. W. (2d) 658; Williams v. Frazer, 6 Tenn. App. 211; Jordan v. Jordan, 145 Tenn. 378, 239 S. W. 423; and Bell v. Gailey, 37 Tenn. App. 17, 260 S. W. (2d) 300. Section 558, Gibson's Suits in Chancery, 3rd Edition, is the same section in the 4th Edition of Gibson, and now appears as sec. 600 in the 5th Edition of this valuable textbook. In this section of Gibson, the following sentence appears: "But when relief is based upon an answer, the whole answer must be taken together, the matters of discharge as well as the matters of charge; and when so considered, must show that the complainant is entitled to relief, or none will be granted on the answer alone."

The Chancellor's ruling was definitely in accord with this provision of the section relied on. Furthermore, we cannot escape the conclusion, that, as pointed out in appellee's brief, complainant and her counsel were endeavoring to use the answer supplemented by the dates on the receipts of complainant to make two payments out of one.

Assignment of error number one is accordingly overruled.

We now take up the second assignment, which complains of the action of the Chancellor in interrupting the testimony of the witness, Marietta Brinkley, and thus cutting off complainant's right to re-examine this witness.

■■ We think this was a matter of trial procedure, the control of which was within the sound discretion of the Chancellor. We cannot say, on the state of the record in this cause, that the Chancellor abused his discretion. Even if it be assumed that he did, however, we think the decree in this cause would be saved from reversal by sec. 10654, Williams' Annotated Code, sec. 27-117 Tenn. Code Ann., because, after an examination of the whole record in this cause, we cannot say that, "It affirmatively appears that the error complained of has affected the results of the trial." Assignment of error Number two is, accordingly overruled.

Assignment of error Number three challenges the ruling of the Chancellor that lack of proper tender was fatal, and that some other remedy was required of complainant.

■ The Chancellor's ruling on this question was evidently based upon the decision of our Supreme Court in the case of Lee v. Security Bank & Trust Co., 124 Tenn. 582, 139 S. W. 690, which holds valid a provision in a trust deed that in the event of default in any of the provisions of same, the entire indebtedness may, at the option of the creditor, be declared due, and that where a trust deed contained such provision, a tender of the amount past due must be made before the holder of the indebtedness has exercised such option, in order to pre-

vent foreclosure. The case of Lee v. Security Bank & Trust Co. has been cited with approval in Stansbury v. Embrey, 128 Tenn. 103, 107, 158 S. W. 991, 47 L. R. A., N. S., 980; in Matthews v. Crofford, 129 Tenn. 541, 555, 167 S. W. 695; and in Brandtejen & Kluege, Inc., v. Pope, 28 Tenn. App. 679, 689, 192 S. W. (2d) 496. We find no error in this ruling of the Chancellor, and assignment of error Number three is, accordingly, overruled.

The fourth assignment complains of the action of the Chancellor in holding that the evidence in this case was wholly incredible and in dismissing the bill.

■ Our Supreme Court, in the case of In re Adoption of Myers, 196 Tenn. 219, 265 S. W. (2d) 12, held that in a case tried without a jury, the question of credibility of the witnesses was exclusively for the judge or chancellor trying such case, and could not be reviewed by the appellate courts. This case involved a trial for contempt of court, and same was treated as quasi criminal in character. We see no reason, however, why the principle of that decision should not be applied to other types of cases, such as the one involved in the instant case. If the Chancellor, in the instant case, disbelieved all of the testimony offered by complainant, the situation results that the complainant has totally failed to establish the allegations of her bill, and the Chancellor, in that situation, had no alternative but to dismiss the bill. The fourth assignment of error is, accordingly, overruled.

The record in this cause discloses that the foreclosure sale which is attacked in this cause, was conducted in a normal manner,—that complainant and her attorney, together with many real estate men, were present; and that neither complainant nor her attorney made any objections at that time. On the whole record in this cause, we

think the equities are with the defendant, rather than with the complainant.

It results, that the decree of the Chancellor must be affirmed. The costs of the cause are adjudged against appellant and her surety on the appeal bond.

Avery, P. J., (Western Section) and Carney, J., concur.