RUDOLPH V. RUSSELL, Complainant and Appellee,
v. R. A. ZANONE and JOHN H. LEE, Defendants and
Appellants.—404 S.W.(2d) 539.

Western Section at Jackson, February 4, 1966.

Certiorari Denied by Supreme Court June 6, 1966.

Gerber & Gerber, Memphis, for R. A. Zanone, appellant.

John H. Lee, pro se.

Robert L. Dobbs, Memphis, for appellee.

BEJACH, J.   In this cause, Judge C. S. Carney of the Tennessee Court of Appeals, Western Section, was unable to be present at the hearing, and by consent of the parties, Hon. George O. Benton of the Madison County Bar, of Jackson, Tennessee, sat in his place.

This cause involves separate appeals by R. A. Zanone and John H. Lee from a decree rendered against them and in favor of Rudolph V. Russell in the Chancery Court of Shelby County. In this opinion, the parties will be referred to as Russell, Zanone and Lee.

By the terms and provisions of the decree appealed from, a judgment in the sum of $1,500 was entered jointly and severally against said Zanone and Lee. Said decree also made perpetual an injunction which prohibited Zanone from taking any further steps in a suit filed by him in cause No. 204-006 in the General Sessions Court of Shelby County, Tennessee, and from levying execution on a judgment recovered in that cause December 6, 1963 against Lee and Russell in the sum of $1,200, representing $1,000 on a promissory note signed by Russell in favor of Lee, and endorsed by Lee to Zanone, plus $200.00 attorney's fee and costs of that cause. The temporary injunction thus made perpetual, and the recovery of the $1,500 judgment against Zanone and Lee were predicated on an original bill filed December 17, 1963. The final decree was entered October 21, 1964.

In his original bill, Russell alleges that he was fraudulently induced to sign the $1,000 note, and defrauded out of 100 shares of Dobbs Houses stock of the value of $1,500 by said Lee and Zanone. The bill charges that Zanone is not an innocent holder for value of the note. It also avers that Russell was fraudulently induced to invest in 25 per cent of the beneficial interest in the Tennessee Realty Trust, allegedly owned by defendant, John H. Lee, and represented to him as being 5,833 shares, worth $58,333.00. The bill, in specific language, alleges:

"Complainant is advised and believes, and upon information avers that the defendants were acting in active concert with each other in procuring and inducing him to become an investor with them to his great financial detriment. That he believes and therefore avers, that the defendant Lee and the defendant Zanone were partners in the business venture known as Tennessee Realty Trust, and as partners, the defendant, Zanone, is, together with the defendant Lee, jointly obligated to pay the $1,500 which the defendant Lee fraudulently secured from the complainant."

The record discloses, and the proof is clear that on May 3, 1963 Russell executed in favor of Lee a ninety day note for $1,000 and delivered to him 15 shares of Dobbs Houses stock which Lee sold to J. C. Bradford & Co. for $1,500, and that he negotiated the note to Zanone. There is considerable diversity in the testimony about the circumstances surrounding the transaction and the conditions, if any, attached to the delivery of said note and stock by Russell to Lee. This diversity of testimony will be hereinafter discussed at some length. The proof in this cause was quite voluminous, the Bill of Exceptions

preserving same consisting of four volumes containing a total of about 500 pages, in addition to another volume preserving the exhibits. Inasmuch, however, as in all this voluminous mass of evidence there is none sustaining the theory on which Russell predicated his cause of action, namely, that Lee and Zanone were partners in the business venture known as Tennessee Realty Trust and, as such fraudulently induced him to execute his note for $1,000 and to part with 100 shares of Dobbs Houses stock worth $1,500, that circumstance alone would be sufficient to warrant reversal of the decree recovered in this cause. Indeed, the clear preponderance of the evidence negatives the allegations of Russell's bill. So far as the record shows, neither Lee nor Zanone ever owned any stock in the Tennessee Realty Trust.

■ Chancery practice in Tennessee requires, as a fundamental principle, that the proof must correspond with the allegations in the pleadings, and relief cannot be granted upon proof of a case substantially different from the case made in the pleadings. Gernt v. Cusack, 106 Tenn. 141, 59 S.W. 335; American Lead Pencil Co. v. Nashville, C. & St. L. Ry., 124 Tenn. 57, 134 S.W. 613, 32 L.R.A.,N.S., 323; Gibson's Suits in Chancery, 5th Ed., sec. 149 and sec. 694, note 19.

In Gernt v. Cusack, complainants sought to recover of the defendant, Cusack, a part of the proceeds of certain oil leases to which they averred they were entitled, received by Cusack as a partner of complainants, upon a sale under an option obtained by one of the complainants, and fraudulently transferred by Cusack to his wife. The answer denied the entire case stated in the bill, and Mrs. Cusack joined in a cross-bill setting up an independent title in herself. The proof sustained the answer and

cross-bill. The Court of Chancery Appeals decided in favor of complainants, but the Supreme Court reversed and dismissed on the ground that complainants made no attack upon or claim under Mrs. Cusack's option. From the Supreme Court's opinion, written by Beard, J., we quote as follows:

"But it is said by counsel of the complainants that, without regard to pleading, the whole case was opened up in the evidence, and the court of chancery appeals, yielding to this insistence, adopted the theory that Mrs. Cusack had colluded with her husband to obtain the fruit of the Gernt option, and was therefore bound in equity to account to complainants. This leads us to the other of the rules referred to, to wit:

2. 'Allegations without proof, or proof without allegations, can never be the foundation of a decree.' King v. Rowan, 10 Heis. 675; Furman v. North, 4 Baxt. 296; Robertson v. Wilburn, 1 Lea 633; Randolph v. Merchants' Nat. Bank, 9 Lea 63; McKelden v. Gouldy, 91 Tenn. 677, 20 S.W. 231; Bradshaw v. Van Valkenburg, 97 Tenn. 316, 37 S.W. 88; Bank v. Carpenter, 97 Tenn. 437, 37 S.W. 278.

\* \* \* \* \* \* \* \* \*

The principle insisted upon by counsel of complainants that, 'if a stranger collusively join with a partner in a rival undertaking, the profits of the collusive or rival undertaking become partnership assets,' is sound and well supported by authority. 1 White & Tu. Lead. Cas. Eq., 62; 2 Lind. Partn. 495; Story, Partn., secs. 174-175. But this principle cannot be successfully invoked here, because there is no averment in the original or amended bill nor admission in the answer of the

Cusacks to warrant its application.'' Gernt v. Cusack, 106 Tenn. 150-151, 59 S.W. 337.

In American Lead Pencil Co. v. Nashville, C. & St. L. Ry., the pencil company sued the railway for loss of a carload of pencils, claiming that breach of a contract between the railway and the pencil company caused the loss. The proof failed to establish any such contract, but did establish a usage between the parties, the terms of which were substantially like those alleged by the pencil company as being set out in a contract. Recovery was denied on the ground that complainants could not recover in a case where the bill alleged a contract, but the proof established a mere usage. From the Supreme Court's opinion, written by Mr. Justice Buchanan, we quote as follows:

''We cannot bring ourselves to the conclusion that a bill, which bases the complainant's right to recover upon the breach of a contract, can be sustained by proof of a usage and no proof of a contract, or by proof of a custom and no proof of a contract. A contract is created by act of the parties. It may be either expressed or implied. It may be either written or oral. It must result from a meeting of the minds of the parties in mutual assent to its terms. It must be founded on a sufficient consideration. It must be mutual, free from fraud or undue influence, not against public policy, and sufficiently definite. See Cyc., vol. 9, 241, 242, and note 1, p. 141.

Usage and custom, on the other hand, in legal contemplation, differ radically in many respects from a contract. Usage is a repetition of acts, and is distinguished from custom in that usage is a fact, while custom is a law. There may be usage without custom,

but there can be no custom without usage to accompany or precede it. Usage consists in the repetition of acts, and custom arises out of this repetition. Esriche Dist. Jurisprudence, quoted in Cutter v. Waddingham, 22 Mo. 206-248, and cited in Cyc. vol. 12, p. 1030, note 1.

\* \* \* \* \* \* \* \* \*

It follows from the foregoing that to permit the complainant to maintain its bill based upon the breach of a contract by proof of the breach of a usage is to permit complainant to profit by a variance between its bill and its proof. The proof does not connect the defendant with the loss, if the contract was in fact nonexistent, and if there was no contract there was no breach, and so, on the proof, the defendant would stand wholly disconnected from the loss of the property.

It is a fundamental principle that the proof must correspond with the allegations in the pleadings. East Tenn., etc., R. Co. v. Collins, 85 Tenn. 227, 1 S.W. 883; East Tenn. Coal Co. v Daniel, 100 Tenn. 65, 42 S.W. 1062; East Tenn., etc., R. Co. v. Lindamood, 111 Tenn. 457, 78 S.W. 99; Foster v. Jackson, 8 Baxt. 433, 434.'' American Lead Pencil Co. v. Nashville, C. & St. L. Railroad, 124 Tenn. 63-65, 134 S.W. 614-615.

From Gibson's Suits in Chancery (5th Ed.) sec. 149, we quote as follows:

''Every fact essential to the complainant's title to maintain the bill, and obtain the relief, must be stated in the bill, otherwise the defect will be fatal. For no facts are properly in issue unless charged in the bill; and of course no proofs can generally be offered of facts not in the bill; nor can relief be granted for matters not charged, although they may be apparent

from evidence; for the Court pronounces its decrees *secundum allegata et probato.*"

Also, from Gibson's Suits in Chancery, 5th Ed., sec. 694, note 19, (b) and (c), explaining a diagram which shows that the execution must be circumscribed by the decree, the decree circumscribed by the evidence, the evidence circumscribed by the pleadings, and the pleadings circumscribed by the procedure of the Chancery Court, we quote as follows:

"b. The next circle represents the evidence, circumscribing both the decree and the execution. If a decree is not justified by the evidence, it may be reversed by appeal, or writ of error, and may be reversed even after execution has issued by a writ of error, and on a supersedeas the execution may be stayed and annulled.

c. The circle next to the outmost represents the pleadings, circumscribing the evidence, the decree and the execution. If the evidence is not pertinent to the pleadings, or does not substantiate the pleading, on appeal or writ of error the decree will be reversed, and if an execution has issued it will be superseded and annulled."

The facts of the instant case fall so completely within the principle established by the above quoted authorities, that we would be willing, on that ground alone, to base our reversal of the lower court's decree. But, even if the original bill had contained allegations upon which the proof adduced could rest; or even if the bill had been so amended after the proof was introduced as to make such evidence competent, we would still be of opinion that complainant, Russell, has made out no case which entitles him to an injunction against Zanone's enforcement of his

judgment recovered in the General Sessions Court on the $1,000 note, or would warrant any recovery of $1,500 against Zanone and Lee. Such being our view of the case, we will now undertake to discuss the case as established by the evidence which was introduced.

■ This cause comes to us under the provisions of Section 27-303 T.C.A., with a presumption that the decree of the lower court is correct unless the evidence preponderates against that decree. After a careful reading of the proof in the voluminous record, however, it is our opinion that the clear preponderance of the evidence is contrary to the decree rendered. As established by that preponderance of the evidence, we think the facts of the case were substantially as hereinafter stated.

In 1962 Lee commenced the promotion of two real estate projects in Memphis, Tennessee, known respectively as the Cinderella House and the Diplomat Apartments. The Cinderella House was to be an establishment for women only, and the Diplomat Apartments was to be a high rise apartment building. The Cinderella House was to be located in the King Cotton Hotel and the Diplomat Apartments on property owned by a Mr. Fortas on Adams Avenue, near Third Street. Lee had options on both the King Cotton Hotel and the Fortas property, and he had had plans and feasibility reports drawn for both projects. Lee needed help in putting together these projects, so he associated a real estate developer by the name of Marvin Spruill with him. Later, while attempting to negotiate loans on these projects, Lee and Spruill found that they needed more financial support, so they brought Russell and Zanone into the venture. Russell was a druggist and Zanone was a jeweller. Financial statements were furnished by both Russell and Zanone for the

purpose of obtaining loan commitments on the two projects. Lee did not know Russell before he came into these ventures, but he did know Zanone. Zanone had previously sold jewelry to Lee on credit and had loaned him money, which obligations had always been paid.

In April 1963, Spruill and Lee arranged to sell the two developments to the Tennessee Realty Trust of Memphis in exchange for shares in the beneficial interest of that trust in the amount of $233,333.33 to each of them. The Tennessee Realty Trust placed a value of $400,000 on the Diplomat Apartments and $300,000 on the Cinderella House. In connection with this deal, Spruill and Lee agreed to give to Russell and Zanone 12½ per cent each of the total shares that Spruill and Lee were to receive in the Tennessee Realty Trust. At that time, Russell was shown by literature of the Tennessee Realty Trust to be on its advisory board. Russell claims that the use of his name as a member of that board was unauthorized, and on June 3, 1963, which was one month after the principle transaction involved in this litigation, he wrote a letter requesting that his name be withdrawn from the Tennessee Realty Trust's literature, claiming that it had been used without his authorization. According to the testimony of Mr. Joe B. Ramsey, the president of the Tennessee Realty Trust, however, Russell had requested that he be placed on the advisory board of that trust and had furnished Ramsey a list of his activities, which list is filed as one of the exhibits in the cause. It is in Russell's own handwriting. About the latter part of April, or first of May 1963, Lee, who had for several months been devoting all of his time to development of the two projects named, was in need of money for personal expenses, and arranged with Russell to put up $2,500 in exchange for 25 per cent of the shares in Tennessee Realty Trust

which Lee was to receive. This was in addition to the 12½ per cent to which Russell was already entitled under the arrangement previously made. It was anticipated that the value of this 25 per cent would be $58,333.33. There is a sharp conflict in the testimony as to whether this $2,500 deal was to be an outright purchase by Russell, or a loan to Lee. At any rate, on the afternoon of May 3, 1963, Lee and Russell met at Spruill's office for the purpose of concluding the transaction, in which Russell was to turn over to Lee $2,500 in exchange for the additional shares in the Tennessee Realty Trust. At that time, certain documents concerning the purchase of the two projects by the Tennessee Realty Trust and the division of shares of the trust between Lee and Spruill were presented to Russell, together with a letter from Lee to Russell in which he agreed to turn over to Russell 25 per cent of the shares in the Tennessee Realty Trust which he was to receive. According to the testimony of Lee, he had expected to receive $2,500 in cash; but, instead, Russell made out a 90 day note in the amount of $1,000, payable to the order of John Henry Lee, and turned over to him 100 shares of stock in Dobbs Houses, Inc., having a value of $1,500. Russell testified that he was to get the stock and the note back if the two projects were not put together, and claimed further that both the note and the stock were to be put up as collateral with Zanone. Spruill, on the other hand, testified differently from both Lee and Russell. He said that the stock was to be put up for collateral, and that the note was to be held for 90 days by Lee. According to the testimony of Lee, Russell suggested that he get Zanone to cash the $1,000 note, because he, Russell, was "loaded" at his bank. At any rate, Lee called Zanone, in the presence of both Spruill and Russell, and told him that he wanted to bring him the

$1,000 note, endorsing it over to him in exchange for $1,000. This telephone conversation is not denied by Russell. After the meeting on May 3, 1963, but on the same day, Lee took the Dobbs House stock to J. C. Bradford & Co. in the Sterick Building, Memphis, Tennessee to sell; whereupon a representative of J. C. Bradford & Co. called Russell to tell him that Lee was there with the stock, undertaking to sell same. Russell admits this telephone conversation from the representative of J. C. Bradford & Co., but he did nothing to prevent the sale of the stock by Lee. In any event, there is no proof in the record to connect Zanone in any way with the Dobbs Houses stock. So far as the record shows, Zanone did not know anything about the Dobbs Houses stock, or about the receipt and sale of same by Lee. Also, on the afternoon of May 3, 1963, Lee took the $1,000 note to Zanone and endorsed it over to him. On the record before us, Zanone must be held to be a holder in due course. Zanone testified, first, that on the afternoon of May 3, 1963, he gave to Lee $985.00 in cash, representing the amount of the note, less 90 days' discount at 6 per cent interest. This testimony was given more than a year after the occurrence of the transactions involved. It developed later, however, when the records of the Union Planters Bank were produced, that the Russell note had been put up by Zanone as collateral for a 90 day loan for himself, out of which he cashed a check for $825.00. The bank stamp showed the loan as having been on May 8, 1963, and the $825.00 check to have been paid on May 9, 1963. After the bank records were introduced, Zanone, with his recollection refreshed, testified that on May 3, 1963 he had given Lee $160.00 in cash, and then on May 7, 1963, put up the Russell note as collateral for a 90 day note of his own at the Union Planters Bank, and cashed a check for

$825.00, the proceeds of which he gave to Lee, thus making up a total of $985.00. He said that these were simultaneous transactions. Because of this discrepancy in the testimony of Zanone, the Chancellor discredited entirely the testimony of Zanone, and held that the making of the note by Zanone, the cashing of his check for $825.00, and delivery of that amount to Lee, were not simultaneous transactions. Mr. John J. Glass, of the Union Planters Bank testified, however, that all the transactions could have occurred on the afternoon of May 7, 1963 after banking hours. He said this could account for the bank stamp of May 8, 1963, as same would not have been put on until the next day's business, and that the stamp showing the cashing of Zanone's check for $825.00 which appeared to be May 9, 1963, was because the Zanone account was on May 8, 1963 overdrawn, and the check was not marked paid until approved by Mr. Tratter, the officer of the bank who had charge of Zanone's account. In spite of the overdraft, however, the check was paid. Zanone's note was also paid by him.

On May 3, 1963, Lee's option on the King Cotton Hotel and on the Fortas property on Adams Avenue, had both expired, the Fortas property option a few days before that date, and the King Cotton option more than a month prior thereto. This circumstance is the principal ground for the Chancellor's holding that Lee and Zanone perpetrated a fraud on Russell. The record shows, however, that as late as June 24, 1963, with the cooperation of both Russell and Zanone, Lee and Spruill were negotiating for renewal of these options. Lee claims that Russell knew as much about the expiration of the options as he did, and there is no proof in the record that Zanone knew anything about the date of expiration of the options. In any event, no mention of either of these options, or of the

fact that same had expired, when his note was executed, is made in Russell's bill filed in this cause. The record shows that as late as August 1963, Russell was doing business with Lee on a friendly basis, having rented to him, at that time, a cleaning establishment.

As was said by the Supreme Court in Landreth v. Schevenel, 102 Tenn. 486, 493, 52 S.W. 148, 149, "It is a settled rule that the right to rescind a contract for fraud must be exercised immediately upon its discovery, and that any delay in doing so, and the continued employment, use, and occupation of property received under a contract, will be deemed an election to confirm it." In the instant case, Russell did not file suit until December 17, 1963, and if he felt that he had been defrauded he must have known that fact, certainly not later than June 24, 1963. His bill alleges that he did not know that Zanone held the note until he was about to be sued on same. As pointed out above, this contention is inconsistent with the telephone call from Spruill's office on May 3, 1963, made by Lee to Zanone in Russell's presence, which conversation is not denied by Russell. Furthermore, every fact alleged by Russell in the instant case, or undertaken to be proved, could have been set up and proved, if true, as a defense to Zanone's suit on the note in the General Sessions Court. The Chancellor attaches great importance to the documents delivered by Lee to Russell at the meeting on May 3, 1963; but, however much importance these documents might have as between Russell and Lee, they do not concern Zanone, and there is not a line of proof in the record to show that Zanone had any knowledge of same. The Chancellor considered Zanone as a discredited witness. We do not agree that this conclusion on the part of the learned Chancellor was correct; but, even if true, and if Zanone's testimony be disregarded entirely,

Russell has completely failed to carry the burden of proof required in fraud cases. In the case of Williams v. Spinks, 7 Tenn.App. 488, 494, Judge Owen, speaking for this Court said:

"On the sufficiency of evidence to establish fraud, it has been stated that the evidence must be clear and satisfactory. Some authorities hold that it must be clear, cogent and convincing or strong and decisive. The general rule is that the evidence to be sufficient to establish fraud should prove a state of facts which is not fairly or reasonable reconcilable with fair dealing and honesty of purpose, and which would lead a reasonable man to the conclusion that fraud in fact existed."

In the case of Bevins v. Livesay, 32 Tenn. App. 1, 221 S.W.2d 106, Presiding Judge McAmis of this Court, said:

"The general principles applicable to cases of fraudulent representation are well settled. Fraud is never presumed; and where it is alleged the facts sustaining it must be clearly made out. The representation must be in regard to a material fact, must be false and must be acted upon the party in ignorance of its falsity, and with a reasonable belief that it was true." Bevins v. Livesay, 32 Tenn.App. 7-8, 221 S.W.2d 109.

In Bilbrey v. Smith, 25 Tenn.App. 446, 450, 158 S.W.2d 735, Howell, J., speaking for this Court, Middle Section, said:

"Fraud must not only be alleged but must be proven and there are many cases upon this subject. In the case of Williams v. Spinks, reported in 7 Tenn.App. at page 488, the Court said:

'Fraud is never presumed, it must be clearly proved, the burden of proof is on the complainant and the law

is, 'in all cases, except those involving transactions between persons occupying fiduciary or confidential relations with each other where the right to relief is based upon the alleged commission of the fraud, the presumption is in favor of the fairness of the transaction and the innocence of the person accused, and the burden of proof is upon the party asserting the fraud to establish the same.' Ency. of Ev., Vol. 6, p. 6.

\*    \*    \*    \*    \*    \*    \*    \*    \*

On the sufficiency of evidence to establish fraud, it has been stated that the evidence must be clear and satisfactory. Some authorities hold that it must be clear, cogent and convincing or strong and decisive. The general rule is that the evidence to be sufficient to establish fraud should prove a state of facts which is not fairly or reasonable reconcilable with fair dealing and honesty of purpose, and which would lead a reasonable man to the conclusion that fraud in fact existed. R.C.L., Vol. 12, Sec. 183.'' Bilbrey v. Smith, 25 Tenn. App. 450, 158 S.W.2d 737.

Our conclusion is that, both because complainant Russell's proof is wholly inconsistent with the allegations of his bill for injunction, and, also, because, even if that discrepancy be overlooked, he has failed to make out against defendants Zanone and Lee any case of fraud which entitles him to the relief granted by the Chancellor, the decree of the Chancellor must be reversed and complainant Russell's bill against both Zanone and Lee be dismissed. The dismissal of Russell's bill entitles Zanone, as is stated in Gibson's Suits in Chancery (5th Ed.) sec. 908, and required by sec. 23-1909 T.C.A., to a decree against Russell and the U. S. Fidelity and Guaranty Company, his surety on the injunction bond filed in this cause,

for $1,200, the amount of the judgment rendered on December 6, 1963 in Cause No. 204-006, in General Sessions Court of Shelby County, Tennessee, together with interest thereon at 6 per cent per annum from December 6, 1963, plus the costs of that cause and the costs of the instant case. Such decree will be entered in this Court.

Avery, P. J. (W.S.) dissents.

George O. Benton, Special Judge, concurs.

AVERY, P. J. (W.S.) (dissenting).

This is a suit from Part II of the Chancery Court of Shelby County, Honorable Ceylon B. Frazer, Chancellor, in which the original complainant, Rudolph V. Russell, filed a bill in Chancery Court styled "Original Bill To Enjoin and Cancel Promissory Note". After the prayer for process, which waives oath to answer, the original bill prayed as follows:

"2—That at the hearing of this cause on the merits, that the Court enter a money judgment against the defendants, R. A. Zanone and John H. Lee, jointly and severally, for $1500.00.

"3—That a writ of injunction issue, by order of this Honorable Court, restraining and inhibiting the defendants, their attorney and agents, from further prosecuting said suit against complainant on said note in said General Sessions Court, and from prosecuting any similar suit in any other Court; and that at the hearing, said injunction be made perpetual, and said note cancelled.

"4—The prayer is for general relief."

The original complainant, Rudolph V. Russell, is represented in this cause by the Honorable Robert L.

Dobbs. R. A. Zanone, one of the original defendants, is represented by the firm of Gerber & Gerber, and John H. Lee, one of the original defendants, represents himself. The original bill was presented to the Chancellor, who later heard the cause upon oral testimony and by consent, without a jury, and upon the presentation of the bill to him, temporary injunction was directed upon the execution of bond for $2,000 and provided that no further action would be taken in the suit to enforce judgment without leave of the Chancery Court. Injunction bond was promptly executed and process served on defendants.

When the cause finally came to trial the Chancellor filed a written finding of facts, sustained the original bill, perpetually enjoined the further proceeding with the judgment in the General Sessions Court of Shelby County and rendered judgment on the prayer of the bill against Zanone and Lee for $1500.00, value of Dobbs House stock involved at time of sale.

Objections and exceptions were saved and an appeal prayed, granted and perfected to this Court, when the case was heard on the 25th day of June 1965. By consent of the parties thereto through their respective counsel of record, the Honorable George Benton, attorney of the Jackson, Tennessee Bar, sitting in the place and stead of Judge C. S. Carney, who desired to be absent at the time of hearing, and the cause was heard by Judges Bejach and Avery of this Court, together with Mr. Benton. Judges Avery and Bejach did not agree on the opinion. Each filed an opinion for Mr. Benton's consideration.

The statement of the case, as we understand it, taken principally from the briefs filed in this cause of R. A. Zanone and John H. Lee, are that in 1962 or prior there-

to, Lee began promotion of two real estate projects in Memphis, Tennessee, known as the Cinderella House and the Diplomat Apartments. The Cinderella House was to be an apartment house for women and Lee was trying to buy the King Cotton Hotel for that purpose. The Diplomat was to be a high rise apartment building located on Adams Street near Third Avenue on a lot or a portion thereof, owned by Mr. Sam Fortas.

Lee procured plans for both projects and prepared feasibility reports. He reported that he had options to purchase the Fortas property and the King Cotton Hotel. He needed help in putting together the projects, so he associated a real estate developer by the name of Marvin Spruill of Memphis to help him with the projects, who was also to help Mr. Lee and defendant Zanone financially and otherwise.

While Lee was attempting to negotiate loans on these projects, it developed that he needed more financial support, so he and Spruill brought plaintiff Russell and Zanone into the ventures, and later Lee procured financial statements from Russell and Zanone for the purpose of obtaining loan commitments on the two developments. Russell was a pharmacist and Zanone was in the jewelery business. Lee did not know Russell prior to his coming into the ventures, however, he did know Zanone. Zanone had sold Lee jewelry and had made money loans to him in the past, and sold jewelry on a credit. Zanone also made loans to Lee for living expenses during the time that Lee was attempting to put the two real estate projects together and have them taken over by the Tennessee Realty Trust.

During the discussion of the projects Spruill and Lee met a number of times in the absence of Zanone, but at

some of the meetings Russell was present and so was Zanone. Also on some occasions Mr. Fortas was present in connection with the property proposed to be purchased and to be made into Diplomat Apartments.

In April 1963 Spruill and Lee sought to dispose of the two developments to the Tennessee Realty Trust of Memphis in exchange for shares of the Trust. Lee and Spruill were each to receive shares of the beneficial interest of the Tennessee Realty Trust in the amount of $233,333.33 in exchange for the Diplomat Apartments and the Cinderella House developments. Also Mr. Joe Ramsey, Chairman of the Board of Trustees of the Tennessee Realty Trust, though not shown in the receipt above mentioned, but by a letter dated April 24, 1963, was to receive shares in said Trust valued at $233,333.33.

It is always painful to disagree with either of your Associates on the bench, but when there is a controverted matter, shown by circumstances in the activities of parties and by the judgment of the Chancellor, before whom a case was tried by consent upon oral testimony, and with the many many statements of our Appellate Courts to which it is not necessary to refer, it has restated the fact that a Court who sees and hears the witnesses testify is in better position to determine the proper weight to be given to their testimony and to determine where the truth lies in the proof of any witness, than a Court who simply reads a bare record, and with our provisions of the statute, T.C.A. 27-303 that when a case is heard by a trial Court without a jury, the judgment comes to this Court on an appeal or an appeal in error with the presumption that the judgment of the Court trying the case, both as to facts and law, is conclusive upon the Appellate Court unless the facts preponderate against the judgment

rendered. When that can not be determined *affirmatively*, then the writer is of the opinion that the proper action for this Court is to affirm the judgment of the lower Court.

To me it appears that with no more capital than Mr. Lee could command at the time the involved parties, particularly Mr. Lee, became so financially involved sometime before May 3, 1963 that the struggle began to become less prospectively productive and an effort started to get some money in Mr. Lee's hands very quickly to relieve others of some load, or get them in position not to stand so large a loss.

As the relationships, associations and efforts are made to grasp the situation so as to receive an equitable picture of all parties and their respective interests the bubble bursts and settles around (1) a note dated May 3, 1963 of $1,000 due ninety days, payable to order of John Harry Lee, Memphis, Tennessee, due August 3, 1963, signed Rudolph Russell, and in the lower left hand "For Tenn. Real. Stock". This quoted statement and the name are in ink longhand.

(2) 100 shares of Dobbs House stock obtained by Mr. Lee from Mr. Russell.

(3) A typed receipt dated May 3, 1963 calling for the payment to him of:

"twenty five (25%) percent of this stock is at this time Fifty Eight Thousand Three Hundred Thirty Three ($58,333.00) dollars, and represent 5,833 shares of beneficial interest in the Tennessee Realty Trust."

Looking at the pleadings so that the Court may try to follow the purpose to be accomplished by the bill and the answers thereto which are prepared by lawyers who

understand the case from the beginning, we find no demurrer, pleas in abatement or other special pleas, it would appear that the lawyers and their clients understood that it was an equitable case in fraud, and we find that when we take the bill as a whole it is one of an equitable nature seeking an injunction, and also seeking the value of 100 shares of Dobbs House stock which it alleges the defendants came by in the way and manner set out in the bill as based on fraud of defendants. It alleges that the complainant was introduced to defendant Zanone by defendant Lee at a time prior to May 3, 1963; that Zanone and Lee ''discussed in glowing terms the business adventure that they were engaged in known as the Tennessee Realty Trust,'' and says that complainant was invited by Lee to ''discuss the possibility of becoming an investor in the Tennessee Realty Trust with his associate and constituent in the enterprize''; that ''he was to become an investor by acquiring twenty-five (25%) percent of beneficial interest in the Tennessee Realty Trust that was allegedly owned by the defendant, John H. Lee.'' The bill then states:

''That this interest was represented to him as being 5,833 shares of beneficial interest in the Tennessee Realty Trust and that the stock was worth $58,333.00. That it was from the false and fraudulent misrepresentations of the defendants that he was induced to become a purchaser in the stock of Tennessee Realty Trust. That he agreed to give the defendant, Lee, one hundred (100) shares in the Dobbs Houses, Inc., and to sign a promissory note in the face amount of One Thousand and No/100 ($1,000.00) Dollars, which note was to be held by the defendant, Lee, for a period of ninety (90) days during which time the twenty-five (25%) in Tennessee Realty Trust was supposed to be

transferred to the complainant. These facts and circumstances were known to the defendant, Zanone, prior to his alleged purchase of the note after May 3, 1963.''

The bill alleges that after May 3, 1963, the complainant went to defendant Lee and demanded his note returned and that he demanded the 100 shares of stock in the Dobbs Houses replaced. Lee had refused to comply with that demand and had informed him that Zanone held the note for the $1,000 and that he, Lee, had assigned it to Zanone. The bill further alleges:

''That the defendant, Zanone, knew of the failure of consideration for the execution of the promissory note prior to his alleged purchase of the same and that he was not a bonafide purchaser for value or a holder in due course.''

It alleges thereafter suit was brought in General Sessions Court and judgment for $1200.00, including attorney's fee, entered, as stated in the injunction bill.

Complainant then charged upon advice, belief and information that Lee and Zanone were in cahoots together; that Zanone and Lee jointly be required to pay this $1,500 which defendant Lee fraudulently secured from the complainant, and general process, special process, etc. were all properly served.

The defendants filed separate answers. These answers are of the same character, however, Mr. Gerber represents Mr. Zanone in which all of the material allegations of the bill are denied and in the first paragraph on page 15 of the record in his answer, he says:

''Defendant neither admits nor denies that it was agreed that complainant was to become an investor by

acquiring 25% of beneficial interest in the Tennessee Realty Trust that was allegedly owned by the defendant, John H. Lee, and that this interest was represented as being 5,833 shares of beneficial interest in Tennessee Realty Trust and that the stock was worth $58,333.00, and demands strict proof thereof if his rights are to be affected thereby."

The answer then denies all of the inducing allegations referred to in the original bill or that he made any false or fraudulent statements in connection with the transaction, and he denies the facts of the whole matter were not made known to him at the time he parted with the note and the stock. In another paragraph he begins by saying:

"Defendant neither admits nor denies that complainant made several demands upon the defendant, Lee, to return $1,500.00 that he had received from the Dobbs House, Inc. stock and the promissory note in the amount of $1,000.00, or in the alternative * * *"

He denies that he ever agreed to return the note; denies that he couldn't get the Dobbs House stock or that he was required to return it; denies that he learned thereafter of Russell's demand on Lee; denies that he, Zanone, knew that he was not a bona fide purchaser and averred that he was; admits that he did sue after the complainant had failed to pay his note and obtained the judgment therefor. This he did also against Lee.

In Lee's answer he denies everything of every importance in a legal way that is alleged in the original bill, except that he does admit that the note was executed; that he took Dobbs House stock and sold it and used the money. He alleges that at the time the complainant invested his note and his stock, or promised to invest them:

"That complainant learned of the proposed transfer of his two projects to Tennessee Realty Trust in return for a stock interest, and complainant requested that he be allowed to invest in the project. That complainant agreed to pay him $2,500.00 in cash to cover an outlay of money which he had had in promoting the projects, in return for 25% of the stock, which he was to receive from the Tennessee Realty Trust. At the time complainant agreed to participate in the transaction, he had full knowledge of the possible failure of the project, and he had full knowledge of the potential profits to be reaped if the project was completed, and he further had knowledge of the fact that he did not receive the stock from Tennessee Realty Trust at the time the complainant invested in the project."

That he would receive 5,833 shares of the stock in the Tennessee Realty Trust if he was able to consummate the transaction. He states:

"that the stock was worth $58,333. That he emphatically denies that it was from false and fraudulent misrepresentations of the defendants to complainant that complainant was induced to become a purchaser in the stock of Tennessee Realty Trust."

Assignments of error by Lee are, "The trial court erred in sustaining the original bill to enjoin and cancel the promissory note." He contends that the evidence preponderates against the judgment in that regard and that the proof was contrary to the pleadings in the "original bill".

II—That the Court erred in rendering judgment for $1500.00 against defendant Lee. He says that this was error because there was no "convincing proof of fraud"

and that he took the stock "on any condition other than fair exchange."

III—That the Court erred in rendering judgment against John Lee because the allegation of the bill "was proven to be 'false' and there was 'no' evidence to support the judgment."

As to this appellant, John Lee, if he could have, at any time, under the facts shown in this record, assumed that he had perfected a contract, such as he narrates, by which he could procure an interest in that which he terms the Tennessee Realty Trust, he knew that the options he claimed to have on both the Fortas property and the King Cotton Hotel property, whether they were options or agreements to purchase, had expired before the note which complainant Russell signed payable to John Lee for $1,000 was ever written, and that when Russell put his name on that note and wrote down in the lower left hand corner. "For Tenn. Real. stock", and he, Lee, carried that note to Zanone's office, he knew he had no stock or that which could be classed or converted into stock, or any valid evidence of any kind or character of an interest or property right to exchange for that which he refers to as shares in the Tennessee Realty Trust. Therefore, it goes without saying that had Lee kept the note he could not have obtained a judgment against Russell thereon for he would not have received it in due course for value. Question posed:

UNDER THE PROVEN CIRCUMSTANCES THEN, DID ZANONE RECEIVE IT IN DUE COURSE OF TRADE FOR VALUE?

The applicable law at the time the involved note was executed and negotiated, is T.C.A. 47-159 and T.C.A. 47-155, as follows:

"47-159—Presumption as to holding in due course.— Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course."

"47-155. Defective title—What constitutes.—The title of a person who negotiates an instrument is defective within the meaning of this law when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud."

John Lee knew on the day that he obtained that note and the stock that these documents which showed that he was to have shares of the value of $233,333.33 in the Tennessee Realty Trust; that one Joe Ramsey was to have shares of a like value and that Marvin Spruill was to have shares of a like value, were at that moment worthless, even if they could have been made valuable before, which is very doubtful. He also knew when he executed and delivered to Russell an agreement on that date in which he said:

"In consideration of one ($1.00) dollar, receipt of which is hereby acknowledged, I, John H. Lee do hereby agree to transfer and assign to Rudolph Russell twenty five (25%) per cent of shares of beneficial interest in the Tennessee Realty Trust that are to be issued me." Exhibit 2 to Russell.

In which document this 25% was shown to have a value of $58,333, was valueless, and as said by the Chan-

cellor, "dead", and so far as we can see from this record it never had been alive. It did not, in legal contemplation, die, it simply never existed and when the receipt stated "the above described shares will be issued pursuant to the contract agreement with the Tennessee Realty Trust" that no such agreement for the issuance existed.

Exhibit 2 was brought to that meaning when the note, Exhibit 1 was there prepared on the typewriter of Mr. Spruill, but that Exhibit 2 was shown to have been there at the same time and was prepared on a typewriter different from that of the note, which Exhibit 2 Mr. Spruill said he saw there. This brought on inquiry from the Court.

"THE COURT: So, if you saw it in your office, it necessarily had to be typed before Mr. Lee came in your office?

THE WITNESS: Yes, sir, before he came in."

Joe Ramsey admits that the preparation of these documents and signed by him, was wrong, that he can see how they left a fraudulent impression that they did contain legal vitality, when as a matter of fact they did not. As stated, the option, if indeed it was ever legally effective as pertains to the Diplomat construction on the Fortas property, expired May 1, 1963 and the option or agreement pertaining to the King Cotton Hotel "Cinderella House", expired March 16, 1963 and in view of that knowledge which Lee possessed, he prepared and delivered that receipt saying that complainant Russell was to receive shares of the Tennessee Realty Trust "which are to be issued to me". It makes the fraud further compounded when that receipt recites the fact that "the above described shares will be issued pursuant to

the contract agreement with the Tennessee Realty Trust.''

So far as there ever being any active trust organization embracing the socalled Cinderella House and the Diplomat Apartments, and who may have been in charge of any trust organization, Tennessee Realty Trust, or by some other designation, possessing any authority to handle either of the two socalled brain-children of Mr. Lee, there is nothing in the record that indicates who had any authority to bind any such socalled organization into any such agreement. No such charter, partnership agreement or trust contract appears.

In view of all the circumstances surrounding this situation hereinbefore pointed out, and many very pertinent incidents which are shown in the record and pointed out in the Chancellor's findings, have not even been referred to in this opinion, we ask ourselves the question, is there any basis for the contention that there was an expressed promise from Mr. Lee relative to redeeming the Dobbs House stock for Russell and returning his note, entering into this scheme to get money on them through negotiating the note to Zanone and selling the Dobbs House stock to obtain money to repay what he owed Zanone, and if so, did or should have Zanone known it when he accepted the note?

While Mr. Spruill was testifying about these occurrences and documents that came into existence clustering around May 3, 1963, particularly these documents dated April 24, 1963 with these large dollar figures in them, including Exhibit 6, Mr. Spruill was asked and answered:

''Q—Al right, sir, Mr. Spruill, after May 3, 1963, using that as a point of time, how long was it before you

first knew that the Tennessee Realty Trust transaction was dying on the vine, so to speak?

THE COURT: Before that question is answered, and I don't know that this witness knows anything about it, but if he knows anything of the conditions under which Dr. Russell put up the fifteen hundred dollars in the stock and the thousand dollar note, he might testify to that. He has never testified to that that I can recall.

MR. DOBBS: Very good, Your Honor.

Q—(By Mr. Dobbs) Were you present when the note that is marked as Exhibit 1 to the testimony of Mr. Russell in this record for $1,000.00 was executed?

A—Yes, sir.

Q—Who all was present on that occasion?

A—The three of us, Mr. Lee and Doc Russell and myself.

Q—This took place where?

A—At my office.

Q—About what time of day, if you recall?

A—Between 2:00 and 3:00 o'clock, possibly.

Q—And it took place on the date on the instrument, May 3rd?

A—Yes, sir.

Q—All right, sir. Was there anything, any discussions between Mr. Lee and Mr. Russell before Mr. Russell put his signature on this note?

A—Yes, there were several discussions. One thing, Doc Russell didn't want to sign a bearer note and Mr. Lee wanted him to sign a bearer note and they finally agreed to make the note out to Mr. Lee, instead of Bearer. That was one discussion.

Another discussion was that Doc said, 'I want it clearly understood that I am to get the shares of stock back, or if I don't, you will redeem it'. He would get the Tennessee Realty Trust shares and certificates, he would get those, and if the deal did not go through with Tennessee Realty Trust, then Mr. Lee was to have redeemed the Dobbs House stock that he was taking from him and borrowing money on it, go down and pay off the loan and redeem the stock and give it back to Doc. Russell, and also give back his note, if he did not get the stock in Tennessee Realty Trust.

Q—To state it another way, would it be your understanding that he would get the stock that is specified in the exhibit here in court, or he would get back the same instruments he was giving Mr. Lee on that afternoon, the note and the stock from Dobbs House?

A—Yes, sir.

Q—That was your understanding?

A—Yes, sir.

Q—Was there any doubt whatsoever but what that was understood by all people in that room, as far as you know?

A—Absolutely no doubt.

"THE COURT: All right. Now, answer this question if you know, Mr. Spruill. What was the note and stock to be used for by Mr. Lee?

THE WITNESS: Mr. Lee, the stock was to have been used by Mr. Lee to borrow money on it to pay Mr. Zanone some money he owed Mr. Zanone.

THE COURT: All right.

THE WITNESS: And the note, I assume, was to be used as just cash by Mr. Lee, if the transaction went through. I don't know what he was going to do with the other money.

THE COURT: How was he to do that if the note was to be used as cash?

THE WITNESS: If the deal had gone through, at the end of 90 days Doc Russell would have paid the note off.

THE COURT: In the interim, in the 90 days, what was he to do with the note?

THE WITNESS: Hold it.''

Mr. Spruill certainly could not have been trying to shield anybody in this transaction. His evidence appears to be somewhat straightforward as he undertakes to reveal his knowledge and understanding of the agreement between Russell and Lee as expressed, and certainly can be presumed from what was said, as the Court reads this record, and in view of the statements of Mr. Lee in his testimony and of Zanone in his testimony, of their affection for each other and their confidence in each other, they being admittedly the first two individuals who agreed to pursue the Diplomat-Cinderella financial scheme inaugurated by Mr. Lee. In sifting the truth from the rubbish, as did the Court who saw the witnesses and heard them testify and who freely expressed his impression of their veracity, we are of the opinion that the trial

Court was fully justified in his decree favorable to Mr. Russell and against Mr. Lee.

We said in Community General Hospital, Inc. v. Diehl, 50 Tenn.App. 268, 283, 360 S.W.(2d) 935, 942:

"So when we come to consider the testimony and proof offered in this case, we must remember that the Chancellor saw these witnesses face to face and heard them testify, and the record reveals that he personally asked them a good many questions. We then are faced with the rule unless the proof preponderates against his decree, we are not to disturb it. Mathis et al. v. Campbell, et al., 22 Tenn.App. 40, 46, 117 S.W.(2d) 764; Allen v. Goldstein, 40 Tenn.App. 308, 291 S.W.(2d) 596, at 603."

Much of what we have said relative to the assignments of error by Mr. Lee are pertinent to the assignments of error by Mr. Zanone. His assignments are:

I—The court erred in sustaining the original bill to enjoin suit and cancel promissory note.

II—The trial court erred in rendering judgment in the amount of $1500.00 against the appellant, R. A. Zanone.

III—The trial court erred in granting a perpetual injunction restraining defendant Zanone from enforcing his judgment in the General Sessions Court of Shelby County.

IV—The trial court erred in rendering judgment of any character against Zanone.

For the moment let us see what Mr. Zanone says he did when that note was handed to him. It is the contention of his counsel that he, Zanone, got confused in his testimony as to how he disposed of that note immediately

after Mr. Lee gave it to him. The record shows that he made three positive statements, each different from the other as to how he handled that note. The substance of his testimony is that he first took the note, sold it to the bank at a discount of 6% or $15.00 and gave Lee $985.00 in cash. He denied depositing the proceeds of that note to his bank account and clearly states that if the $985.00 was not delivered to Lee in cash, it was by a debit slip. He said he did not make a deposit of the proceeds of that note to his business account and assigned as a reason therefor that he did not intermingle his personal funds with his business funds.

The bank records did not sustain this and at his third effort to explain it, he said he gave Lee about $150.00 or $160.00 and on the same day of the discount of the note he cashed a check for $825.00, that check was drawn by Zanone payable to Zanone and nothing appears about it to indicate that it was ever credited to Lee.

With the many different explanations of how the $1,000 note dated May 3, 1963, signed by Rudolph Russell, due 90 days, payable to John Harry Lee, was handled, taking all explanations by maker Russell, payee and endorser Lee, holder and hypothecator Zanone, and holder Union Planters National Bank, there is no way to tell what went with the money.

A recapitulation shows the arranged handling as follows:

1—Executed note written on typewriter of Spruill, carried by Lee endorsed and delivered to holder Zanone May 3, 1963.

2—Same note endorsed John Harry Lee and R. A. Zanone pledged as collateral to Union Planters Na-

tional Bank on May 7, 1963 to a note of the same amount, dated May 7, 1963, due 90 days payable to Union Planters Bank, signed R. A. Zanone.

3—Item two signed by Zanone cancelled August 8, 1963 and new note executed with same collateral, due 90 days.

4—Item three, Zanone note shows paid September 17, 1963.

5—Deposited to R. A. Zanone Company May 8, 1963, account Union Planters National Bank, $985.00.

6—Check dated May 7, 1963 payable to R. A. Zanone $825.00 drawn on R. A. Zanone Company, the company name signed by Va Wood, endorsed R. A. Zanone, and shows it was paid and cancelled by perforation May 9, 1963.

To accept either theory of explanation by Mr. Zanone, it could not be:

1—That he discounted the note given him by Lee signed by Russell at the bank the day Lee obtained it and says he gave it to Zanone and Zanone sold it to the bank and gave Lee $985.00 that day. That explanation can not coincide with the dates, figures and incidents shown by the record, and can not be true.

2—Zanone's testimony that he did not induce that matter into his business bank account, can not be true and then account for the occurring transactions from May 3 to May 8, as shown above.

3—If it be true that when Lee carried Russell's $1,000 note to Zanone on May 3, 1963, Zanone took the note then and gave Lee $160.00 from his wallet and Zanone held

that note until he went to the bank, hypothecated it as collateral to his note for $1,000 on May 7, obtained $985.00 and deposited it to his business account as shown by Exhibit 10, which was not credited to his account until May 9, and that day or the next day withdrew $825.00 by check to himself, as an individual, from his business account and at that time or later gave the $825.00 to Lee, that would account for the proceeds of the Russell note of $1,000, but to do that you have to assume that Zanone paid himself the $15.00 discount plus the $160.00 Lee says Zanone paid him on May 3 from his pocket and these three items would make $1,000, amount of the Russell note.

Zanone says that at the time Lee delivered him the note Lee told him he had this Dobbs House stock, and at the same period when Zanone was handling the note, a sale of the Dobbs House stock was being manipulated by Lee. On May 3, the date of the note, this R. A. Zanone Company business account was overdrawn $713.16, with nothing showing deposited to that account between May 2 and May 6. On May 6, $1567.73 was deposited to Zanone's account and the same day $1575.00 was drawn by check from that said account, which left that account overdrawn by $408.00, until that $985.00 was deposited to it on May 8.

The account figures on the sale of that stock are not in the record. Lee says he used that money to pay debts that he had incurred for living expenses. Both Lee and Zanone say that Zanone had furnished him money prior to that for living expenses. There absolutely is no way to determine whether or not that the proceeds of the stock which Lee admits selling and the net from the note which Zanone discounted, did not go through the same bank

account, but from all of the proof it is clear that there had been some conversation between Russell and Lee and also a conversation between Spruill and Lee in Lee's effort to get $2500.00.

As to Spruill, counsel for Zanone, we think, has properly answered why Spruill didn't let Lee have $2500.00. Learned counsel says in his brief:

"On April 24, 1963, Lee had approached Spruill about the $2500.00, but Spruill did not want to let Lee have that much money until the projects were definitely put together".

Counsel is very correct in the statement that, "there was a sharp conflict in the testimony as to whether the $2500.00 was loaned on an exchange", (meaning an exchange for certain shares of the Tennessee Realty Trust), which Lee was contending he was to receive. The conflict in that regard is certainly great, and the Chancellor seeing and hearing the witnesses, resolved that conflict in favor of Russell to the effect that Russell's testimony is supported by the testimony of Spruill in that Russell was to have returned to him the note and the stock unless he received the shares in the Tennessee Realty Trust which the note called for, and that Russell had no knowledge that the options had expired at the time he parted with the note and the stock of the Dobbs House.

Zanone having made the two distinctive statements which refute the reliance upon these records scattered from May 3 through May 8, with his acknowledged prior dealings with Lee and with the expressed statement written in the lower left hand corner of that note signed by Russell "For Tenn. Real stock", can we conscientiously say he was a holder in due course of that note?

The answer would be to say that this was a question to be determined when suit was brought on the note by Zanone against Lee and Russell.

An examination of the testimony that Mr. Zanone admits he gave when the judgment was taken by him against Russell in the General Sessions Court, since he was asked and answered in this Chancery hearing:

"Q—Did you personally put any money into either of these proposed apartments?

A—No, sir.

Q—Not any money at all?

A—No, sir."

He then stated in response to the following questions:

"Q—I will ask you at the hearing on December 6th, when you were testifying, if I asked you:

(Reading) You didn't know anything about the transaction, are you saying that now?

A—That—Marvin Spruill and Russell and Lee and myself were going to have a venture, and I put more money into it than anybody else, and I lost my money. Now—so, this note here that I gave to John Lee was part of his payment, and he lost it, too. (Apparently he was talking about a $500.00 note which in his testimony in this case he said that he gave John Lee).

Q—Are you saying Lee lost money in it?

A—As far as I know, he lost a whole lot of money in it.

Q—How much?

A—That, I don't know. I don't keep his books.

Q—You were in on the deal yourself, weren't you?

A—Right.

Q—And you mean to say you had no idea what was lost?

A—I knew what I lost."

While on the stand Mr. Zanone admitted that he knew Lee for two years before he ever knew Russell or Mr. Spruill and that he talked with Lee about the Diplomat Apartments and the Cinderella House for some period before he ever met the other two.

His answer to those questions of his activity with Lee are somewhat evasive and lead one to believe that he was making an effort to evade a full truthful answer. He was asked:

"Q—Well, then is it the truth, as you look back on it, that you talked with Lee about the Cinderella and Diplomat Apartments before you ever knew Spruill or Russell?

A—Well, I would say that, yes, I don't know whether it could be true, but I will say yes.

Q—Did you advance Mr. Lee any money to the Cinderella House prior to knowing Mr. Spruill or Mr. Russell?

A—No, that was for a different venture again, which I don't want to get into this lawsuit.

Q—It was a different venture, is that right, that you let him have the money for?

A—Yes, sir.

Q—And yesterday, when you said you were giving him living expenses, was it some other venture unrelated to this that you were talking about?

A—It was the other and this one, too.''

Much is said in this record, in an effort to show a circumstance which would make Mr. Russell connected with the Tennessee Realty Trust in such a way as that he would be bound to know the things that he positively testified that he did not know, and did not do.

A document headed ''Prospectus, 100,000 shares of Beneficial Interest Tennessee Realty Trust'' consisting of 12 printed pages in small type, has been filed. In this document there is the name, among several others, of ''Mr. Rudolph V. Russell, 1015 N. Graham, Memphis, Tenn. Mr. Russell is President of Russell's Pharmacy, Inc. and active in civic affairs in the city of Memphis.'' With these others he is designated ''Advisory Board'' member, which is also referred to hereinafter.

One Mr. J. B. Ramsey, shown to be a Trustee of the Tennessee Realty Trust, was examined at length about his connection with the entire transaction, and he was specifically requested to state what his connection was with Exhibit 5, which we have referred to heretofore in this opinion, showing how Spruill, Ramsey and Lee were to divide the block of shares of the Tennessee Realty Trust between themselves. Also Exhibit No. 6, which is the document shown to have been accepted and signed by Mr. Spruill, issued by J. B. Ramsey to the effect that this Tennessee Realty Trust agreed to ''purchase the equities in the above described properties in the following manner'', and this is the document which Mr. Ramsey signed as a trustee and Mr. Marvin L. Spruill signed as

accepting it for the group composed of those who were making the effort to obtain the King Cotton Hotel and the Fortas property, referred to as the Diplomat Apartment. It is noticeably conspicuous that in neither of these documents dated Auril 24, 1963, is the name of either Russell or Zanone mentioned. However, just nine days later on May 3, 1963, Exhibit 2, part of which is copied on page 10 hereof, and said to be by Lee delivered to Russell on same day as the involved note was signed by Russell. These three exhibits are greatly important to a correct understanding of the motive for Exhibit 2.

Now Mr. Ramsey made the statement that on one occasion he had a conversation in the back end of the office of Mr. Russell's Pharmacy in which Mr. Russell agreed that he would become a member of the hereinbefore stated ''Advisory Board''. Let's just first see what this Advisory Board is or was or was to be, for apparently there was none in effect at the time. On page eight (not numbered) of this printed prospectus is this statement:

''The Trustees may, and presently intend to, purchase an indeterminate number of additional shares (out of this offering) for cash at the public offering price.''

Immediately under the above quote is that designation, ''Advisory Board'' and then this statement follows:

''The Trustees are authorized to hire investment counsel and/or to appoint an Advisory Board whose advice and recommendations shall not be binding upon the Trustees, to serve at the pleasure of the Trustees and to be compensated by the Trust.''

This creates an office without function. Therefore, when we first look at his testimony and all this record

about the tremendous responsibility of a board of trustees and what "Advisory Board" means in legal contemplation, it doesn't mean anything. Bearing in mind that this prospectus containing that statement was not to be effective until March 29, 1963, which was only about 35 days until the execution of these notes and these documents on May 3, and particularly the one dated May 3, 1963, signed by John H. Lee, which is a typed agreement, brought into one of those meetings when Mr. Russell wasn't around anywhere, but delivered to Mr. Russell at the time that note was signed and the Dobbs House stock obtained, it does appear that just as soon as Mr. Russell saw this prospectus with his name on it, he immediately wrote the letter, Exhibit 3, in which he proceeded to tell Mr. Ramsey that he had never agreed to be on such a Board and wanted his name removed immediately from that prospectus and not to be put into any more that were to be printed. The reply to that letter was read into the record and we have shown it to be in volume IV, page 419 of this record.

With respect to these things Mr. Ramsey signed, let's see what he said as to how he arrived at the conclusion that Mr. Russell had agreed to be a socalled "Advisory Board Member", he was asked if he, Russell, signed anything, his answer was:

"No, I did not, but since that time we have learned a little, and we do now, but not at that time."

He was further asked:

"Q—Now, after the Tennessee Realty Trust became associated with Marvin Spruill, Harry Lee, and Russell—(interrupted)

A—We were never associated with them, please sir. We were never associated with them.

Q—You agreed with them. Then you did have a business relationship, to say the least, with them. Didn't you?

A—They submitted us two prospectuses which we agreed to buy and trade them stock for their equity. We were never associated with them in any way.

Q—Would this have been what is now in this record as Exhibit 6 to the testimony of Russell? Would you look at that and see if you recall that?

A—Yes, sir, I believe I do. This is one of the prospectuses, the two prospectuses that they talked to us about."

He was asked what he knew about Zanone's interest in the proposed matter and said that he didn't know anything of any consequence, as far as he knew he was just a bystander and was asked and answered several questions by the Court with respect to his interest in these referred to shares of $233,000 plus and in describing how he looked at the situation, he said, "It was a promotional deal they got up". Whereupon the Court said:

"THE COURT: Does your letter say that?

THE WITNESS: No, it does not, but I couldn't have shared in it at all personally.

THE COURT: I wouldn't think you could, but we have so many strange things here—I was just wondering. As a matter of actual curiosity, what was this trust

to receive for its issue of a rather substantial face amount of participation in the trust?

THE WITNESS: This apartment building was supposed to have been delivered to us, a lock and key job.

THE COURT: What do you mean, delivered to you in that condition?

THE WITNESS: Well, a completed job.

THE COURT: You mean built?

THE WITNESS: Yes, sir, and they told us it would have this building and that they would have so much equity in it, and would they buy it if they could produce it, which we agreed to do, but they never could produce it, or never did produce it.

THE COURT: Well, according to your testimony, Mr. Ramsey, this letter just does not mean a thing in the world, does it?

THE WITNESS: Well, which one is it, Your Honor?

THE COURT: This letter that he wrote, Spruill wrote.

THE WITNESS: *They brought me this thing at home late one night to sign, sometime in the night. I don't guess it means too much.* (Emphasis added)

THE COURT: This letter does not mean too much because there was no such thing in existence?

THE WITNESS: No, sir, this was a proposal, something these people were trying to put together.

734

THE COURT: Don't you realize that somebody could take that letter and perpetrate a fraud on somebody else?

THE WITNESS: Well, I didn't at the time.

THE COURT: Well, do you realize it now?

THE WITNESS: Yes, sir."

It seems significant to this Court that we are talking about a transaction that occurred prior to May 1963. It perhaps began sometime in 1962, that is, this effort of Mr. Lee, and Mr. Ramsey was on the stand testifying sometime in September 1964. It rather appears that this Tennessee Realty Trust was worth nothing at the time that this blow-up came in connection with this organization in May of 1963, for Mr. Ramsey was on the stand a year and a half later and then said the Tennessee Realty Trust at that time was worth only $700,000. He said the letter he wrote to the stockholders dated March 13, 1963, Exhibit 4, did not state the truth.

So it would appear from Mr. Ramsey's testimony, which we believe the Court can reasonably accept a portion of, at least, be understood whether the options were still effective or not, these two projects had to be completely built, "a turn-key job" complete in every detail, and that what he meant when he signed the statement that he did sign, that there would then be some equity in the property. If the two projects were put together and completely built in accord with what he understood the information that Mr. Lee and others had told him at a time when he says these papers were brought to him at night, at his home, and were handed to him, after being prepared by some of the promoters, and he signed

them. It clearly appears that he gave but little thought to the transaction, he denies ever going to New York in connection with this particular project of Mr. Lee. In other words, these exhibits which carry Mr. Ramsey's signature appear to be brain-thoughts of Mr. Lee or Mr. Spruill, both of whom were active in the writing of these documents.

To an individual engaged in the drug business, and with no experience in the field of promotion and development, these documents afford the same satisfaction as an open nipple would to a baby. They could have meant nothing legal, but they appeared to mean something real. THERE COULD HAVE BEEN NO CONTRACT BINDING ON THE TENNESSEE REALTY TRUST TO PURCHASE ANYTHING. Mr. Ramsey so states, and further states that these developers were offering a completely built turn-key job. There being no contract to build, which Mr. Ramsey says was to be done before these offers could at all be binding, certainly Mr. Lee and Mr. Spruill, who had refused to make even a loan of $2500.00 to Mr. Lee until the ''projects were put together'', so when these documents, together with the other exhibits associated with them are carefully analyzed, it is easy to see that the mind of a person who had had nothing to do with their preparation would easily be misled.

Another document which is admitted to have been personally written in ink longhand by Mr. Lee is filed as Exhibit 22 to cross-examination of Lee, though apparently not signed by Mr. Lee, but with a line there for his signature with his name under it, sheds some light on his thinking about the situation in connection with other things that he said. It is as follows:

"Rudolph Russell,
Russell Pharmacy
Memphis, Tenn.

"This agreement entered into this 3 day of May 1963, by and between John H. Lee and Marvin L. Spruill hereinafter referred to as the Party of the first part, and Rudolph Russell and R. A. Zanone hereinafter referred to as the Parties of the second part.

"The parties of the first part do hereby agree that they will deliver over to the parties of the second part Twenty-Five (25%) percent of any shares of beneficial interest of the Tennessee Realty Trust that is received by the parties of the first part through any consummated deals made with or for the said Tennessee Realty Trust, and that said shares shall be delivered without any further remuneration or consideration on part of the parties of the second part.

"_____

/s/ John H. Lee."

That document was a part of the whole story that evidently came into the mind of Mr. Lee after he realized that even though Exhibits 5 and 6, together with Exhibit 2, were the final result of what was delivered or apparently delivered to complainant Russell, this longhand ink document written by Lee was a part of the whole mental scheme on that date, or to be used on that date, and it would seem from this whole record that Mr. Lee thought more of the typewritten Exhibit 2, signed by him and witnessed by Spruill, which carries the notation "1,000.00 note, 100 shares Dobbs House" would be required to get Russell to sign the note and part with the 100 shares of Dobbs House stock.

There is no necessity to repeat what our Courts have said through the centuries about how they have abhored, fought and made a determined effort to detect fraud and remedy it. Courts of Equity are not bound by the strong rules of Courts of law in the investigation of fraud. While we often understand and refer to what Mr. Gibson says in connection with an effort to uncover fraud, it helps us to return to his statement, as we study cases of the character before us, and re-read what he says in picturing the manner which fraudulent wrongs are practiced. Section 456, page 520, Vol. 1 5th edition, Gibson's Suits in Chancery says:

"Fraud assumes many shapes, disguises and subterfuges, and is generally so secretly hatched that it can only be detected by a consideration of facts and circumstances, which are frequently trivial, remote and disconnected, and which cannot be interpreted without bringing them together, and contemplating them all in one view. In order to do this it is necessary to pick one fact or circumstance here, another there, and a third yonder, until the collection is complete."

In his next Section, 457, on page 521, he says:

"When Fraud Will Be Presented.—It is often said, that fraud will not be presumed: by this nothing more is meant than that fraud will not be presumed merely because it is alleged. When however, certain states of facts are once shown to exist, a presumption of fraud will arise sufficiently strong to throw on the defendant the burden of proving that there was nothing fraudulent, or inequitable, in the transaction sought to be impeached. Among these states of facts, the following are the most common.

\* \* \* \* \* \*

"Where Misrepresentations Have Misled. When the misrepresentations made by the defendant were of such a character as would naturally induce any ordinary person to act upon them, and the complainant did act upon them, to his detriment, then the defendant will be presumed to have made the misrepresentation to induce the complainant so to act."

In view of the fact that Mr. Lee was a promoter and had been in preparation of these projects for a long time before ever Russell was in any wise mentioned with it, and had been a close friend and in different types of business affairs with Zanone, from all the elements in this case, as found in this record, there certainly was a time when the business transactions in which they were entering, that any concealment one from the other, would be an extreme badge of fraud, and that any failure to speak when duty demanded it, would also be a further badge of fraud.

In Section 979, page 211, Vol. 2, Gibson's Suits in Chancery, it is said:

"Fraud, in the sense of a Court of Equity, properly includes all acts, omissions and concealments, which involve a breach of legal or equitable duty, or of trust or confidence justly reposed, and which are injurious to another, or by which an undue and unconscientious advantage is taken of another. * * *

"2. Judgments, or decrees, or awards obtained, or cancelled or discharged, as the result of fraud on the part of the defendant, will be enjoined or enforced as the complainant's rights may require: 3. Money, or other property, obtained by the defendant through fraud will be declared a trust fund for complainant's

benefit, and the defendant, and all claiming under him, not bona fide purchasers, will be compelled to surrender it, or account for it;"

Certainly there were no better friends than Mr. Lee and Mr. Zanone. Each of them expressed great friendship for each other and very great confidence in each other. At R. 527 of Vol. V Mr. Lee was being asked about working with Mr. Zanone on this very transaction that took place on May 3, and said:

"Mr. Zanone, and I, as far as working together, Mr. Dobbs, if two friends can be working together, then we were working together, because our relationship has been purely friendship, and here on this stand or anywhere else I respect the friendship of Mr. Zanone."

It must be remembered that when this note was signed or about to be signed, Mr. Lee, Mr. Spruill and Mr. Russell were there together, and either before Russell got there or later, Mr. Lee called Zanone, telling him what was taking place and Zanone suggested that the note be made "to bearer". That suggestion certainly would not have been made unless Lee had told him what they were doing, that is, entering into a conditional agreement, as both Spruill and Russell testify. To that suggestion Mr. Russell objected, put his confidence in Lee and agreed to make the note to Lee, and did so conditionally as held by the Chancellor. He also delivered the stock of Dobbs House to Lee, signed it and turned it over on that occasion, with the same agreement, and when Lee reached Zanone he immediately told him about having that stock.

That friendship, so far as this record shows, is still going on, for in 1964, on March 24 Mr. Alberding addressed a letter to "Mr. John Lee, R. A. Zanone Com-

pany, 701 Madison Building, Memphis, Tennessee'', that is Exhibit 15 to Lee and is being used in an effort to have the Court believe that he had some basis for still believing that he could work out this consummation of the two projects. It would appear from that letter that there had never been any hope expressed upon which there could be any reliance that these two projects would be consummated by purchasing and building and delivering a turn-key job, as was stated by Mr. Ramsey.

Zanone said to Lee:

''I did know inasmuch as I was nice to John Lee for several years and lots of years, that I would be compensated some way for helping him out in different ventures—I mean in this venture.

\* \* \* \* \* \*

''Oh, I have given him money at different times, six hundred dollars, five hundred dollars, four hundred dollars.

''Q—Would that have been in connection with this particular project, the Diplomat Apartments and the Cinderella House?

A—No, that was for him to live on until he got things in shape.

''THE COURT: You mean you would give him six hundred dollars or five hundred dollars or four hundred dollars for living expenses at a time, Mr. Zanone?

''THE WITNESS: Yes, sir, Your Honor. Mr. Lee, I have always found to be very honorable, and at one time he owed me about forty-two hundred dollars, which he paid.''

In Bevins v. Livesay, 32 Tenn.App. 1, 7, 221 S.W.(2d) 106, 109, Judge McAmis, Presiding Judge of this Court, repeated the oft made statement:

"It is, of course, true that equity will not relieve against false representations in a case where both parties have equal knowledge of the matter misrepresented. 'Fraud involves deception and if one knows the truth, and is not deceived, he is not defrauded.' Freeman v. Citizens' National Bank, 167 Tenn. 399, 70 S.W.(2d) 25, 29.

"In Hamilton v. Gilbraith, 15 Tenn.App. 158, it was said: "The general principles applicable to cases of fraudulent representation are well settled. Fraud is never presumed; and where it is alleged the facts sustaining it must be clearly made out. The representation must be in regard to a material fact, must be false and must be acted upon by the other party in ignorance of its falsity, and with a reasonable belief that it was true.' See also Long v. Range, 31 Tenn.App. 176, 213 S.W.(2d) 52, opinion by Judge Howard."

However, that rule is subject to the exception that:

"If a party represents as true, that which he knows to be false in such a way and under such circumstances as to induce a reasonable man to believe that it is true and it is meant to be acted on, and the person to whom the representation has been made believing it to be true acts upon the faith of it and by so acting sustains damages, such representation is fraudulent and will sustain an action by the party damaged." Shwab v. Walters, 147 Tenn. 638, 251 S.W. 42.

In that case the defendant had made:

" * * * a statement of the financial condition of a corporation in which the complainant had purchased stock even though not absolutely known by the seller to be false, amounted to fraud if made without belief in its truthfulness or recklessly careless whether it was true or false, and that the buyer, even though he made some investigation of his own, could maintain an action for the fraud, it appearing that his purchase of the stock was greatly influenced by the statement."

On the basis of this statement here quoted the analogy to the case involved in this opinion is that while Lee undertakes to confess a belief that after these options had expired on the two projects involved he could yet get some renewal and thus he was not to be charged with fraud. Certainly he was under obligation to specifically reveal to Russell, when he had him to sign the note and deliver the Dobbs House stock, that these options had expired and give Russell an opportunity to act upon Lee's good faith in his anticipation that he could get these options renewed. This is a gross failure to reveal that which he should have done, particularly since he carried this note with the notation on it showing it was for the purchase of Tennessee Realty Trust shares.

In Bevins v. Livesay, supra, 32 Tenn.App. 1, 8, 221 S.W.(2d) 106, 109, there was a prospectus showing the earnings of the business at the time the defendant parted with his money. Judge McAmis further said:

"In this case, until after complainants had parted with their money, all of the information they had concerning the earnings of the business came from defendants who justifiably might be assumed to have complete knowledge of all the facts necessary to determine the

earnings. The prospectus purported to give the earnings down to the last cent over a fixed period of time leaving the natural inference that the amounts indicated came from authentic records. Such representations were calculated to lull complainants into the belief that they were true and cause them to refrain from making a more extensive investigation. We think the Chancellor rightly held that defendants cannot escape the consequences of the misrepresentations on the grounds asserted.''

It is not shown in this record that Russell ever saw or had in his possession any so-called options or agreements to purchase either of the two properties involved. He depended alone on what Lee told him. It would appear that the relationship between Lee and the entire group was somewhat that of partners, with Russell putting absolute confidence in Lee to do what he said he would.

It was held as far back as White v. Flora, 2 Tenn. 426 and cases there cited, repeated and approved in White v. Cox (1816), 4 Tenn. 79, that:

"Suppression of the truth, or suggestion of that which is not so, will prevail in equity to set aside any conveyance, or transfer, or contract made under the influence of such suggestions or suppressions.''

We think that rule is still applicable, particularly where there has been confidence reposed by an unsuspecting individual engaged in the drug business in a promoter of financial schemes and plans such as we have in the instant case.

It is said in Domestic Sewing Machine Company v. Jackson, 83 Tenn. 418, ''When it is one's duty to dis-

close'', is classified under three heads: (1) In a fiduciary relationship; (2) Where it appears one or each of the parties to the contract expressly repose trust and confidence in the other; (3) Where the contract or transaction is intrinsically fiduciary and calls for perfect good faith.

Can there hardly be a transaction which would, on the part of Mr. Lee, require more certainty that he reveal the fact that these options or agreements to purchase had expired at the time of the involved transaction which caused Russell to sign the note and give up his stock in Dobbs House was consummated?

In Shell Oil Co. v. State Tire & Oil Co., 126 F.2d 971, the Court of Appeals, 6th Circuit (1942), appealed from the Western District, Western Division of Tennessee, approving Section 525, Restatement of Torts, it is said:

'' 'One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction is liable to the other for the harm caused to him by his justifiable reliance upon the misrepresentation.' Restatement of Torts, sec. 525.

''This is also the law of Tennessee. Schwab v. Walters, 147 Tenn. 638, 251 S.W. 42; Hines v. Willcox, 96 Tenn. 148, 33 S.W. 914, 34 L.R.A. 824, 832, 54 Am. St.Rep. 823. Where a party intentionally or by design produces a false impression in order to mislead another, or to obtain an undue advantage of him, there is positive fraud in the fullest sense of the term. Rose v. Foutch, 4 Tenn.App. 495, certiorari denied by the Supreme Court of Tennessee May 7, 1927 and cases cited. Where there are 'acts, omissions, or concealments which

involve a breach of legal and equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another,' there is actionable fraud. Smith v. Harrison, 2 Heisk. 230, 49 Tenn. 230; Bennett v. Massachusetts Mutual Life Ins. Co., 107 Tenn. 371, 64 S.W. 758.

The Chancellor also held, and we think properly so, that the consideration represented by the note and the stock involved was conditional, that is, that unless there could be a delivery of the Tennessee Realty Trust shares as testified to by both Spruill and Russell, and as shown by the notation on the note that they were not to constitute a completed deal, nor did they represent negotiable paper transferred in due course of trade.

Counsel for Zanone in his brief contends that the variance between the pleadings and the proof is cause enough alone to reverse the judgment of the lower Court, and that the facts which constitute a fraud necessary to relief must be set out in the original bill and sustained by the proof. For this position on counsel's part he relies on Gernt v. Cusack, 106 Tenn. 141, 59 S.W. 335 and American Lead Pencil Co. v. Nashville, C. & St. L. Ry., 124 Tenn. 57, 134 S.W. 613, 32 L.R.A., N.S., 323.

We have read these two cases carefully in connection with the statement in counsel's brief and we are of the opinion they are not controlling in either aspect.

If we are to believe Mr. Ramsey, the two projects involved were not only to be put together, but were to be completed in every detail, with the project on the Fortas property built from the ground up complete and the King Cotton Hotel remodeled and completed before there was

ever to be a single share allocated from the so-called Tennessee Realty Trust in exchange or as purchase.

Some criticism is due all parties involved in their effort to present their respective positions and some of them have falsely made statements. However, we have no criticism for Attorneys Mr. Gerber and Mr. Dobbs, they have presented excellent briefs and arguments. To the Trial Court who heard all the testimony, saw the witnesses and wrote what we believe to be an excellent opinion and entered a decree which we are required not to reverse unless the proof preponderates against it, we think has reached the conclusions which equity requires. Mr. Lee, in his effort to put over his position, has hardly met the standard of conduct in the trial required in a Court of Equity. We attribute this to his effort to represent himself.

All assignments of error are, therefore, overruled and the original decree affirmed with cost.

Since the injunction issuing in this cause has been made perpetual, the decree in this Court may remand this cause to the Chancery Court of Shelby County for the enforcement of the decree.